**Certiorari Granted, March 14, 2014, No. 34,548**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2014-NMCA-042**

**Filing Date:  January 14, 2014**

**Docket No. 28,219**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**NORMAN DAVIS,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**John M. Paternoster, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**FRY, Judge.**

**{1}**     This case is before us on remand from our Supreme Court. *See State v. Davis* (*Davis II*), 2013-NMSC-028, ¶ 35, 304 P.3d 10.  The Supreme Court upheld the district court's determination that Defendant voluntarily consented to a search of his property. *Id.* ¶ 2.  On remand, we conclude that Article II, Section 10 of the New Mexico Constitution provides

1

greater protection than the Fourth Amendment to the United States Constitution when aerial surveillance of a person's home is involved. We further conclude that, under the New Mexico Constitution, the aerial surveillance in this case constituted a search requiring a warrant or an exception to the warrant requirement. Although Defendant consented to a physical search of the curtilage after the surveillance search, there was insufficient attenuation between the warrantless aerial search and Defendant's consent. Accordingly, we reverse the district court's denial of Defendant's motion to suppress the marijuana and other evidence seized during the search.

**BACKGROUND**

**{2}**     The New Mexico State Police, in conjunction with the New Mexico National Guard, undertook a plan called "Operation Yerba Buena" in order to locate marijuana plantations in Taos County, New Mexico. During the operation, a spotter in a helicopter alerted a ground team "to the presence of a greenhouse and vegetation in Defendant's backyard." *Davis II*, 2013-NMSC-028, ¶ 3. One of the ground team members, Officer William Merrell, made contact with Defendant, identified himself, and said that "the helicopter [was] looking for marijuana plants and they believe they've located some at your residence." He then asked Defendant for permission to search the residence, and our Supreme Court held that Defendant gave voluntary consent. *Davis II*, 2013-NMSC-028, ¶ 34.

**{3}**     Officers searched Defendant's property and found marijuana and drug paraphernalia. Defendant was indicted for possession of marijuana and possession of drug paraphernalia. Defendant sought suppression of the evidence seized during the search, arguing, among other things, that the helicopter surveillance of his property violated the federal and state constitutions. The district court denied Defendant's motion, determining that the helicopter surveillance was "just barely permissible." Defendant entered a conditional guilty plea and appealed the denial of his motion to suppress. On appeal, this Court reversed the district court's denial of the suppression motion on the basis that Defendant's consent was the result of duress. *See State v. Davis* (*Davis I*), 2011-NMCA-102, ¶ 13, 150 N.M. 611, 263 P.3d 953, *rev'd*, 2013-NMSC-028. The Supreme Court reversed this determination and remanded the case with instructions for this Court to consider Defendant's remaining arguments.

**DISCUSSION**

**{4}**     On remand, we address the following arguments raised by Defendant: (1) whether the aerial surveillance of Defendant's property prior to the consensual physical search of his property violated the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution; and (2) whether Defendant's consent to the search of his property was purged of the taint of the alleged constitutional violation arising from the aerial surveillance. Because of our disposition, it is not necessary for us to consider whether the district court improperly denied Defendant's motion requesting that the court visit his property during the suppression proceedings. We address each argument in turn.

2

**A.      Standard of Review**

**{5}**      "The reasonableness of a search or seizure under the Fourth Amendment and under Article II, Section 10 of the New Mexico Constitution presents a mixed question of law and fact, which we review de novo." *State v. Leyva*, 2011-NMSC-009, ¶ 30, 149 N.M. 435, 250 P.3d 861. In reaching the ultimate issue of reasonableness, we look "for substantial evidence to support the trial court's factual findings, with deference to the district court's review of the testimony and other evidence presented." *Id.*

**B.      Whether the Aerial Surveillance of Defendant's Property Violated the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution**

**{6}**      We first consider Defendant's argument that the aerial surveillance of his property prior to the consensual search of his property violated the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. "Because both the United States and the New Mexico Constitutions provide overlapping protections against unreasonable searches and seizures, we apply our interstitial approach." *Ketelson*, 2011-NMSC-023, ¶ 10 (internal quotation marks and citation omitted). Under the interstitial approach, "we first consider whether the right being asserted is protected under the federal constitution." *Id.* (internal quotation marks and citation omitted). "If the right is protected by the federal constitution, then the state constitutional claim is not reached." *Id.*; *see also State v. Jean-Paul*, 2013-NMCA-032, ¶ 5, 295 P.3d 1072 (stating that "[u]nder New Mexico's interstitial approach to state constitutional interpretation, this Court should only reach the state constitutional question if the federal constitution does not provide the protection sought by the party raising the issue"). If the right is not protected by the federal constitution, "we next consider whether the New Mexico Constitution provides broader protection, and we may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Ketelson*, 2011-NMSC-023, ¶ 10 (internal quotation marks and citation omitted).

**1.      Fourth Amendment**

**{7}**      We begin with Defendant's argument that the aerial surveillance of his property violated the Fourth Amendment to the United States Constitution. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Since the United States Supreme Court's decision in *Katz v. United States*, 389 U.S. 347 (1967), "[t]he touchstone of [a] search and seizure analysis is whether a person has a constitutionally recognized expectation of privacy." *State v. Ryon*, 2005-NMSC-005, ¶ 23, 137 N.M. 174, 108 P.3d 1032. In the specific context of the constitutionality of an aerial surveillance operation, the question boils down to whether such an operation constitutes a search under the Fourth Amendment. As noted by a leading commentator, "[i]f the individual does not

3

have a protected interest, actions that might otherwise be labeled a search will not implicate the Fourth Amendment." Thomas K. Clancy, *What is a "Search" Within the Meaning of the Fourth Amendment?*, 70 Alb. L. Rev. 1, at 2 (2006). Thus, in order to label the aerial surveillance in the present case a search, we must first conclude that Defendant had a protected interest. In considering this question, the United States Supreme Court has applied the two-prong analysis of privacy expectations set forth in *Katz*, where a court considers first whether the defendant has an actual or subjective expectation of privacy and, second, whether that expectation is one that society is prepared to recognize as reasonable. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring); *see also California v. Ciraolo*, 476 U.S. 207, 211-15 (1986) (applying *Katz* in addressing whether aerial surveillance of the defendant's property was a violation of the Fourth Amendment).

**{8}** The two leading United States Supreme Court cases establish that a defendant does not have a protected interest under the Fourth Amendment if an aerial surveillance of a home and its curtilage[1] is conducted from a public vantage point and if it reveals something that a person has not protected from aerial scrutiny. In the first case, *Ciraolo*, police received an anonymous tip that the respondent was growing marijuana in his backyard, which was enclosed by a six-foot outer fence and a ten-foot inner fence. 476 U.S. at 209. When officers could not see what was in the yard from ground level, they flew a plane in navigable air space over the house at an altitude of 1000 feet, and they were able to observe marijuana plants in the respondent's yard. *Id.* The Court concluded that because the police observations "took place within public navigable air[]space in a physically nonintrusive manner . . . , [the] respondent's expectation that his garden was protected from such observation [was] unreasonable and [was] not an expectation that society is prepared to honor." *Id.* at 213-14 (citation omitted).

**{9}** In the second case, *Florida v. Riley*, the contents of the respondent's greenhouse were screened from ground level observation by structures, trees, and shrubs, but some of the greenhouse's roofing panels were either translucent or missing. 488 U.S. 445, 448 (1989). An officer was able to see what he thought was marijuana through openings in the roof when he circled the greenhouse in a helicopter at an altitude of 400 feet. *Id.* A plurality of the Court held that the respondent "could not reasonably have expected that his greenhouse was protected from public or official observation" from navigable air space. *Id.* at 450-51. The plurality noted that there was no evidence that helicopters flying at 400 feet were rare or that "the helicopter interfered with [the] respondent's normal use of the greenhouse or of other parts of the curtilage." *Id.* at 451-52. In addition, "no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury." *Id.* at 452. Accordingly, "there was no violation of the Fourth

---

[1]"Generally, the curtilage is the enclosed space of the grounds and buildings immediately surrounding a dwelling house." *State v. Hamilton*, 2012-NMCA-115, ¶ 16, 290 P.3d 271 (internal quotation marks and citation omitted). The curtilage enjoys the same privacy protections of the home itself. *Id.*

4

Amendment." *Id.*

**{10}** These cases teach that an aerial surveillance is not a search for Fourth Amendment purposes if the objects observed are in open view from a legal vantage point. *See* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.3(g) (5th ed. 2012) (explaining that under *Ciraolo*, "it is no search to make a naked-eye observation into the curtilage from navigable air space"). This is especially true if the surveillance is not unduly disruptive.

**{11}** Turning to the present case, the helicopter surveillance passes muster under the Fourth Amendment. While Defendant testified that the helicopter was hovering about fifty feet above him and that it was "kicking up dust and debris," there is nothing in the record suggesting that this altitude was outside the range of navigable air space, nor is there evidence that the helicopter interfered with Defendant's normal use of his residence or greenhouse. Officer Merrell testified that the plastic cover on Defendant's greenhouse was "somewhat clear" and that the plants in the greenhouse were pressed up against the ceiling.[2] One of the helicopter spotters testified that, from the air, marijuana looks "real bright green, more of a lime green, compared to the rest of the vegetation in the area." Thus, under the rationale articulated in *Ciraolo* and *Riley*, Defendant's expectation that the contents of his greenhouse were screened from public aerial view was unreasonable.

### 2. Article II, Section 10 of the New Mexico Constitution

**{12}** Because the Fourth Amendment does not protect Defendant's subjective expectation of privacy, we now consider whether the New Mexico Constitution provides greater protection. *See Ketelson*, 2011-NMSC-023, ¶ 10 (stating that if an asserted right is not protected by the federal constitution, "we next consider whether the New Mexico Constitution provides broader protection").

**{13}** At issue in this case is Article II, Section 10 of our state constitution, which our Supreme Court has consistently interpreted as providing greater privacy protections than the Fourth Amendment. *See Leyva*, 2011-NMSC-009, ¶ 51 ("It is well-established that Article II, Section 10 provides more protection against unreasonable searches and seizures than the Fourth Amendment."). "Our Supreme Court has emphasized New Mexico's strong preference for warrants in order to preserve the values of privacy and sanctity of the home that are embodied by this provision." *State v. Granville*, 2006-NMCA-098, ¶ 24, 140 N.M. 345, 142 P.3d 933.

**{14}** With this in mind, we discern two threads of analysis in *Ciraolo* and *Riley* that are

---

[2]Although the district court found that greenhouses in the area "were constructed of non-transparent fiberglass, wood[,] and opaque plastic sheeting[,]" the evidence supporting that finding related to a surveillance target other than Defendant.

inconsistent with our jurisprudence under Article II, Section 10. The first involves the United States Supreme Court's focus on the fact that law enforcement personnel in aircraft were no different from passengers in aircraft who could plainly see the marijuana in question. The second thread involves an emphasis on various factors meant to assess the intrusiveness of the aerial surveillance.

### a.        Airborne Police Are Not the Equivalent of Airborne Members of the Public

**{15}**    With respect to the first aspect of the United States Supreme Court's analysis, the Court noted in *Ciraolo* that "[a]ny member of the public flying in this air[]space who glanced down could have seen everything that these officers observed." 476 U.S. at 213-14. And in *Riley*, the Court observed that the accused "could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter had it been flying within the navigable air[]space for fixed-wing aircraft." 488 U.S. at 450-51.

**{16}**    The only New Mexico cases addressing aerial surveillance were decided before our Supreme Court began interpreting Article II, Section 10 more broadly than the Fourth Amendment.[3] These older cases, decided in 1983, seemingly anticipated the United States Supreme Court's analysis in *Ciraolo* and *Riley* (decided in 1986 and 1989, respectively) and assessed the propriety of aerial surveys under the Fourth Amendment in part by considering what could be seen from the air. *See State v. Rogers*, 1983-NMCA-115, ¶¶ 2, 7, 100 N.M. 517, 673 P.2d 142 (concluding that the defendant had no reasonable expectation of privacy "with respect to marijuana plants protruding through holes in his greenhouse roof to the extent of their visibility from the air"); *State v. Bigler*, 1983-NMCA-114, ¶ 8, 100 N.M. 515, 673 P.2d 140 (holding that the defendant had no reasonable expectation of privacy in his marijuana crop "to the extent of visibility from the air").

**{17}**    In contrast to the rationale stated in these cases, New Mexico cases decided since *Rogers* and *Bigler* have emphasized that "Article II, Section 10, protects citizens from governmental intrusions, not intrusions from members of the general public." *Granville*, 2006-NMCA-098, ¶ 29. As the dissent in *Ciraolo* observed, there is a "qualitative difference between police surveillance and other uses made of the air[]space. Members of the public use the air[]space for travel, business, or pleasure, not for the purpose of observing activities taking place within residential yards." 476 U.S. at 224 (Powell, J., dissenting). Because New Mexico's post-*Rogers*/*Bigler* case law has interpreted Article II, Section 10 more broadly than the Fourth Amendment, we conclude that police flying over a residence strictly in order to discover evidence of crime, without a warrant, "does not comport with the distinctive New Mexico protection against unreasonable searches and seizures." *Garcia*, 2009-NMSC-046, ¶ 27.

---

[3]*See State v. Garcia*, 2009-NMSC-046, ¶ 28, 147 N.M. 134, 217 P.3d 1032 (stating that our Supreme Court diverged from Fourth Amendment analysis for the first time in 1989).

6

**b. Intrusiveness Factors Are Not Useful**

**{18}** As to the second type of analysis under the Fourth Amendment, the Court in *Riley* seemingly assessed the intrusiveness of the aerial surveillance when it observed that "there was no undue noise, and no wind, dust, or threat of injury." 488 U.S. at 452. And in *Rogers*, this Court also evaluated similar factors, such as the "altitude of the aircraft, use of equipment to enhance the observation, frequency of other flights[,] and intensity of the surveillance." 1983-NMCA-115, ¶ 9. The district court in the present case relied heavily on factors similar to those mentioned in *Rogers* and *Riley* when it assessed the propriety of the helicopter surveillance.

**{19}** We fail to see how an analysis of intrusiveness factors aids in the determination of whether an aerial surveillance is a search. The privacy interest protected by Article II, Section 10 is not limited to one's interest in a quiet and dust-free environment. It also includes an interest in freedom from visual intrusion from targeted, warrantless police aerial surveillance, no matter how quietly or cleanly the intrusion is performed. Indeed, it is likely that ultra-quiet drones will soon be used commercially and, possibly, for domestic surveillance. Michael J. Schoen, Michael A. Tooshi, *Confronting the New Frontier in Privacy Rights: Warrantless Unmanned Aerial Surveillance*, 25 No. 3 Air & Space Law 1 (2012); *see* Intelligence Advanced Research Projects Activity, "Great Horned Owl (GHO) Program," http://www.iarpa.gov/Programs/sc/GHO/gho.html. Such advances in technology demonstrate the increasingly diminished relevance of intrusiveness factors, as courts have regarded them in the past, in the analysis of what constitutes a search.

**c. The Aerial Surveillance in This Case Constituted a Search Under Article II, Section 10**

**{20}** We decline to perpetuate both the analysis in the United States Supreme Court's cases and in *Rogers* and *Bigler* focusing on what is openly visible to the public from the air and the analysis in *Rogers* based on intrusiveness factors. Since *Rogers* and *Bigler* were decided, our courts have diverged from the Fourth Amendment, and the analysis in those cases fails to "serve the robust character and honored history of [Article II, Section 10] with special attention to its purpose of police regulation." *Garcia*, 2009-NMSC-046, ¶ 31. Instead of relying on visibility and intrusiveness factors, we adopt the view that if law enforcement personnel, via targeted aerial surveillance, have the purpose to intrude and attempt to obtain information from a protected area, such as the home or its curtilage, that could not otherwise be obtained without physical intrusion into that area, that aerial surveillance constitutes a search for purposes of Article II, Section 10. We explain the evolution of our view below.

**{21}** We find persuasive the analysis in *Kyllo v. United States*, 533 U.S. 27 (2001). While *Kyllo* did not involve aerial surveillance, its determination that seeking information through "sense-enhancing technology" can constitute a search aptly applies to aerial surveillance, in our view. 533 U.S. at 34. *Kyllo* involved the question "whether the use of a thermal-

imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the meaning of the Fourth Amendment." 533 U.S. at 29. On suspicion that the petitioner was growing marijuana in his home, a police officer scanned the home in the early morning hours from a position across the street from the residence and from the street behind the house. *Id.* at 29-30. The scan showed that sections of the home were relatively hotter than other sections, which suggested to police that the petitioner was using halide lights to grow marijuana. *Id.* at 30. Based in part on the scan's results, police obtained a search warrant and discovered "an indoor growing operation." *Id.*

**{22}**    In holding that the scan constituted a search under the Fourth Amendment, the Court first reviewed its jurisprudence, whose definition of a search evolved from the notion of common law trespass to the two-prong *Katz* assessment of whether the person has "manifested a subjective expectation of privacy" that society recognizes as reasonable. *Kyllo*, 533 U.S. at 31-33 (internal quotation marks and citation omitted). The Court then noted that "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Id.* at 33-34. While acknowledging the difficulty of applying the *Katz* test to searches of "areas such as telephone booths, automobiles, or even the curtilage," *Kyllo*, 533 U.S. at 34, the law at a minimum recognizes that the expectation of privacy in the interior of the home is reasonable when the police "obtain[] by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, . . . at least where . . . the technology in question is not in general public use." *Id.* (internal quotation marks and citation omitted).

**{23}**    We believe the *Kyllo* Court's analogy to physical invasions is in harmony with our jurisprudence under Article II, Section 10. Given our "strong preference for warrants in order to preserve the values of privacy and sanctity of the home," *Granville*, 2006-NMCA-098, ¶ 24, it follows that police should be required to secure a warrant before attempting to obtain, through flight, information from a home or its curtilage that they would not otherwise be able to obtain without physical intrusion.

**{24}**    While *Kyllo*'s requirement that the sense-enhancing technology not be in general use by the public makes sense in the context of that case, we place no reliance on this as a factor. The only rationale for that requirement seems to be that it provides a way to distinguish police conduct from conduct by a member of the public in order to acknowledge the Fourth Amendment's protections against *government* intrusion. A better means of protecting against government intrusion—and one that is consistent with Article II, Section 10 jurisprudence—is the addition of a requirement that the goal of government personnel is to intrude. As Professor Clancy put it, "[i]n assessing whether a search has occurred, inquiry must be made into whether it is the goal of the government agent to learn something about the target when engaging in an activity or employing a technological device." Clancy, *supra*, at 39. This inquiry also permits the government to use evidence obtained inadvertently by law enforcement personnel. *See, e.g.*, Clancy, *supra*, at 41 (hypothesizing

8

that it would not be a search if a police officer tripped and fell on a bus passenger's soft-sided luggage and, in bracing himself, felt a brick-like object in the luggage).

{25}     This inquiry, plus the inquiry as to whether the information could otherwise only be obtained via physical intrusion, "add[s] clarity of meaning for decision-makers" like police and magistrates contemplating the issuance of warrants. Clancy, *supra*, at 39. Our Supreme Court has stated that clarity for such decision makers is an important consideration under Article II, Section 10. *See Garcia*, 2009-NMSC-046, ¶ 32 (explaining that the indeterminacy of Fourth Amendment analysis "is cause for concern in that it fails to provide law enforcement with a useful framework with which to predict when its actions will trigger constitutional scrutiny").

{26}     Putting this analysis in the context of aerial surveillance, such surveillance constitutes a search under Article II, Section 10 if (1) the government agent(s) involved intend to obtain information from a target or targets through aerial surveillance, and (2) if the information to be obtained through aerial surveillance could not otherwise be obtained without physical intrusion into the target's home or curtilage. If the surveillance constitutes a search, then the government agent(s) must obtain a search warrant before conducting the surveillance, absent an exception to the warrant requirement, such as exigent circumstances.

{27}     In the present case, the evidence presented to the district court established that the agents involved in Operation Yerba Buena undertook helicopter surveillance of several homes, including Defendant's home, with the purpose of finding marijuana plantations. In addition, the evidence suggesting that Defendant was growing marijuana in his greenhouse could not have been obtained without aerial surveillance unless the agents physically invaded the greenhouse. Consequently, the helicopter surveillance of Defendant's property constituted a search requiring probable cause and a warrant. Because the agents did not obtain a warrant, they had to rely on an exception to the warrant requirement. In this case, our Supreme Court determined that they obtained from Defendant valid consent to search. The question thus becomes whether Defendant's consent was sufficiently attenuated from the illegal search to be purged of the illegality's taint.

**C.     Defendant's Consent Was Not Sufficiently Attenuated From the Illegal Search**

{28}     "The fruit of the poisonous tree doctrine bar[s] the admission of legally obtained evidence derived from past police illegalities." *State v. Monteleone*, 2005-NMCA-129, ¶ 16, 138 N.M. 544, 123 P.3d 777 (alteration in original) (internal quotation marks and citation omitted). Before considering the question of whether Defendant's consent was tainted by the prior illegal helicopter search, we first address the State's argument that Defendant failed to preserve the question. The State maintains that Defendant did not specifically argue at the suppression hearing that his consent was tainted, and the district court did not address the taint issue because it found that Defendant's consent was voluntary.

{29}     We conclude that Defendant was not required to expressly raise the fruit of the

9

poisonous tree doctrine because the district court determined that the helicopter surveillance was constitutional and, therefore, there was no reason for Defendant to have raised or argued that the doctrine applied. *See State v. Ingram*, 1998-NMCA-177, ¶ 9, 126 N.M. 426, 970 P.2d 1151 ("Evidence which is obtained as a result of an unconstitutional search or seizure may be suppressed under the exclusionary rule." (internal quotation marks and citation omitted)).

**{30}** Because we disagree with the district court's determination, we now consider whether Officer Merrell obtained Defendant's consent "by means sufficiently distinguishable to be purged of the primary taint" of the illegal helicopter surveillance of Defendant's property. *Monteleone*, 2005-NMCA-129, ¶ 17 (internal quotation marks and citation omitted). "If there is sufficient attenuation between the illegality and the consent to search, the evidence is admissible." *Id.* "To determine whether there was sufficient attenuation, we consider the temporal proximity of the [illegality] and the consent, the presence of intervening circumstances, and the flagrancy of the official misconduct." *Id.* (internal quotation marks and citation omitted).

**{31}** Here, Officer Merrell obtained Defendant's consent through exploitation of the illegal helicopter search. The evidence suggesting that Defendant was growing marijuana was obtained via the aerial surveillance of his property. Officer Merrell then approached Defendant, who was standing outside his home, and obtained consent. *Davis II*, 2013-NMSC-028, ¶ 5. Given that Officer Merrell entered Defendant's property solely as a result of information obtained in the helicopter search, as well as the lack of any intervening circumstances between the aerial search and Defendant's consent, there was insufficient attenuation to purge Defendant's consent of the taint resulting from the unconstitutional aerial surveillance. *See State v. Portillo*, 2011-NMCA-079, ¶ 25, 150 N.M. 187, 258 P.3d 466 ("It is established law that evidence discovered as a result of the exploitation of an illegal [search or] seizure must be suppressed unless it has been purged of its primary taint."). The district court erred in holding the surveillance to be constitutional instead of determining it to be unconstitutional and suppressing the evidence obtained from the physical search. Because we reverse the district court's denial of Defendant's suppression motion, we need not address Defendant's argument that the district court erroneously denied his motion for a judicial view.

**CONCLUSION**

**{32}** For the foregoing reasons, we reverse the district court's denial of Defendant's suppression motion.

**{33}** **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

10

**I CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**

**JONATHAN B. SUTIN, Judge (specially concurring).**

**SUTIN, Judge (specially concurring).**

{34}    I concur in the Opinion's insightful and forward-thinking application of Article II, Section 10 of the New Mexico Constitution.  I have some additional thoughts.

**Weighing Factors**

{35}    Deciding warrantless aerial surveillance cases, by weighing factors of altitude, FAA regulations, extent of physical intrusion, location of the property, means of surveillance (as the district court found, helicopter swooping to lower altitude and men on a mission as if they were in a state of war searching for weapons or terrorist activity), and complaint anonymity, is fraught with arbitrary or painstakingly difficult and subjective determinations. Note the district court's "just barely permissible" characterization of the "helicopter search," and the court's characterization of the facts as "teeter[ing] dangerously close to exceeding the limitations implicit in the Fourth Amendment."  The weighing approach is less effective than Justice Scalia's approach in *Kyllo*.  Citizens have an expectation of privacy with respect to the police looking into their homes and curtilage.  If the police, as in this case, are purposefully targeting a home, curtilage, or residential area to discover illegal marijuana growing activity by, as the district court in this case characterized it, "flying around generally in an effort to spot greenhouses" in a "random investigation," the police should have to pass warrant muster as a condition precedent to conducting the aerial surveillance. This requirement is restrictive, no doubt.  But the better judgment in a circumstance like that before us is to protect the privacy of the home and curtilage and require a validly issued warrant for the targeted surveillance.  Here, Defendant had an expectation of privacy with regard to his curtilage.  The targeted surveillance was a search.  The search was warrantless and presumed to be unlawful.  No exception overcame the presumption.

**Taint of Consent**

{36}    I offer another basis on which we ought to be able to hold that the warrantless and unreasonable aerial surveillance search tainted Defendant's consent.  The district court determined factually that the spotter could not have observed marijuana and that any belief the spotter had was speculative.  After noting that " 'Carson' area plus 'greenhouse' propelled the spotting officer to conclude by speculation that behind the walls of the greenhouses were prohibited plants[,]" the court perceived "a surreal 'profiling' aspect to the police behavior."  Stated differently, the court determined that it was objectively unreasonable to believe that the spotter had, in fact, observed marijuana, thereby rendering

11

such "observation" by the spotter to be mere speculation. Speculation does not give rise to reasonable suspicion. *See Leyva*, 2011-NMSC-009, ¶ 23 ("Reasonable suspicion must consist of more than an officer's hunch that something is amiss; it requires objectively reasonable indications of criminal activity."). Because Officer Merrell's statement to Defendant that "marijuana had been identified growing in his greenhouse from the air" was based exclusively on the spotter's speculation, by extension, it was unfounded in reasonable suspicion. *See State v. Vandenberg*, 2002-NMCA-066, ¶ 18, 132 N.M. 354, 48 P.3d 92 (recognizing that "reasonable suspicion based on information obtained from another officer require[s] that [the] officer providing information must himself have possessed reasonable suspicion"), *reversed on other grounds by* 2003-NMSC-030, 134 N.M. 566, 81 P.3d 19. Thus, Defendant's encounter with Officer Merrell was essentially a circumstance in which a police officer, without reasonable suspicion or a warrant, approached Defendant at Defendant's own home and accused him of engaging in criminal activity. This is not reasonable police conduct at the front door of a person's home when the officer does not have a probable cause basis on which to make the accusation. The spotter's non-credible, speculative belief that gave rise to Officer Merrell's factually incorrect statement was causally related to Defendant's consent, and therefore the consent was tainted. *See State v. Figueroa*, 2010-NMCA-048, ¶ 35, 148 N.M. 811, 242 P.3d 378 (holding that the defendant's consent that was sought and granted "on the heels of" improper police questions was tainted).

## Fourth Amendment

{37}    I would hold the surveillance search unreasonable under the Fourth Amendment as well as under Article II, Section 10 on the basis that the expectation of privacy analyses in cases that involve targeted aerial surveillance investigations and invasions into a home and curtilage using modern technology, whether thermal imaging technology or a helicopter, should now be controlled by Justice Scalia's *Kyllo* analysis and test as set out earlier in the Opinion of this Court.

_____
**JONATHAN B. SUTIN, Judge**


**Topic Index for *State v. Davis*, No. 28,219**

**APPEAL AND ERROR**
Standard of Review

**CONSTITUTIONAL LAW**
Fourth Amendment
New Mexico Constitution, General
Suppression of Evidence

**CRIMINAL LAW**

Controlled Substances

**CRIMINAL PROCEDURE**
Search and Seizure