# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2015-NMSC-034

Filing Date:  October 19, 2015

Docket No. S-1-SC-34548

STATE OF NEW MEXICO,

Plaintiff-Petitioner,

v.

NORMAN DAVIS,

Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
John M. Paternoster, District Judge

Hector H. Balderas, Attorney General
Martha Anne Kelly, Assistant Attorney General
Santa Fe, NM

for Petitioner

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Respondent

Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Santa Fe, NM

Marc Rotenberg
Alan J. Butler
Jeramie Scott
Washington, D.C.

for Amicus Curiae Electronic Privacy Information Center

1

**OPINION**

**BOSSON, Justice.**

**{1}** Defendant Norman Davis was convicted of possession of marijuana after New Mexico State Police officers consensually searched his greenhouse and seized 14 marijuana plants. That search was the result of "Operation Yerba Buena 2006," a comprehensive aerial surveillance of Davis' property and the surrounding area conducted by a coordinated law enforcement effort that allegedly discovered marijuana plants growing on Davis' property. We decide whether that aerial surveillance, and the manner in which it was conducted, amounted to a warrantless search of Davis' property contrary to rights secured to him under the Fourth Amendment to the U.S. Constitution. Concluding that his federal constitutional rights were violated in this instance, we reverse the opinion of the Court of Appeals to the contrary as well as Davis' conviction below.

**BACKGROUND**

**{2}** Over a period of time during 2005 and 2006, the New Mexico State Police received several reports that residents were growing marijuana plants throughout rural areas of Taos County, New Mexico. The informants, however, were unable or unwilling to provide the police with specific locations where marijuana was growing due to the remoteness of the area and fear of retaliation. In investigating the reports, the New Mexico State Police, Region Three narcotic agents, and the New Mexico National Guard organized Operation Yerba Buena, described as "a collaborative effort in the identification of marijuana plantations in Taos County with the use of two Army National Guard OH 58 Jet Ranger helicopters."

**{3}** Prior to the execution of Operation Yerba Buena, the State Police developed an operation plan to provide a common working framework for everyone participating in the operation and to ensure that all participating agencies followed State Police policies and procedures. The plan divided the search areas of Carson Estates and Twin Peaks—vast rural tracts in Taos County—between two separate search teams. Each team consisted of an Army National Guard helicopter with an observer and a ground team comprised of individuals from various law enforcement agencies. All ground team officers were required to carry standard issue State Police tape recorders to be used during any "*interviews/arrests, [and] during [any] contacts from which there are reasons to believe a complaint could result in an arrest.*" (Emphasis in original.)

**{4}** During the operation, the helicopter observers were instructed to fly over the assigned portions of the search area to look for potential "marijuana plantations." Once an observer spotted marijuana plants, he was instructed to contact the corresponding ground team staged at a pre-identified area and guide the team to the location of the plants. The ground team would then approach and make contact with the particular house to confirm or deny the existence of marijuana. The helicopter was to remain in the vicinity to provide

2

cover and safety to its ground team.

**{5}** On August 23, 2006, at approximately 9:00 a.m., the helicopters departed the Taos Regional Airport. The total operation lasted approximately ten hours. During that time, the helicopter observers identified possible marijuana plantations at eight properties and directed the ground teams accordingly.

**The Davis residence**

**{6}** Observer Travis Skinner, upon identifying a potential marijuana plantation, directed his ground team—five vehicles containing at least six armed law enforcement officers—to the Davis residence. Davis' property was enclosed from ground level view by fences that ran along the property line, several large trees and bushes, and a "shade screen." However, when looking down on Davis' property from the helicopter, Sergeant Skinner was able to see and relay to the ground team the presence of a greenhouse as well as what appeared to be marijuana plants located at the back of Davis' property near the house. Sergeant Skinner also informed the team that there were dogs on the property.

**{7}** Davis stated he was "in bed and not feeling very well when [he] heard a helicopter hovering very low, right on top of [his] house." He stated that the helicopter was making "a considerable racket" and that when the sound did not go away, he went outside to see "what . . . was going on." He observed the helicopter hovering approximately 50 feet above his head "kicking up dust and debris that was swirling all around."

**{8}** Sergeant Bill Merrell of the New Mexico State Police confronted Davis near Davis' front door. Other officers were present on either side of his driveway. Sergeant Merrell, as heard on the tape recording, approached Davis, identified himself, and said "it appears that the helicopter . . . [was] looking for marijuana plants and they believe they've located some at your residence." Sergeant Merrell asked Davis for permission to search the residence for the marijuana plants seen by the observer. The noise from the helicopter was audible in the background of Sergeant Merrell's recording.

**{9}** In response to Sergeant Merrell's accusation, Davis admitted that he was growing marijuana in his greenhouse and allowed the officers to search his property. Davis signed a written consent authorizing a complete search of his greenhouse and residence. This Court previously upheld the validity of Davis' consent. *See State v. Davis*, 2013-NMSC-028, ¶ 35, 304 P.3d 10 (*Davis II*). The officers seized 14 marijuana plants from Davis' greenhouse. Neither the flyover of Davis' property nor the resulting search was accompanied by a search warrant.

**{10}** Several nearby residents characterized the helicopter flyovers during Operation Yerba Buena as terrifying and highly disruptive. Kelly Rayburn watched a helicopter fly around his house about "half a dozen times." Rayburn said the helicopter flew so close to his roof that the downdraft lifted off a solar panel and scattered trash all over his property.

3

Victoria Lindsay observed a helicopter sweeping back and forth over her property, sending debris and personal property all over the yard. Lindsay also observed the helicopter hovering very close to the ground at a neighbor's greenhouse. Merilee Lighty observed a helicopter flying over her property for about 15 minutes. She said it was so close that the downdraft affected her trees and her bushes.

**{11}** William Hecox did not notice any real dust flying at the time of the flyover, but after the helicopter left he noticed that one of his four-by-four beams was broken at the ground and another one was broken three feet up from the ground. Hecox specifically stated that the beams were not broken prior to the helicopter flying over. He also stated that the noise and effect from the helicopter upset his turkey and fowl and caused them to "squawk[] and run[] around."

**Suppression hearing**

**{12}** A grand jury indicted Davis on possession of marijuana contrary to NMSA 1978, Section 30-31-23(A) and (B)(3) (2005), and possession of drug paraphernalia contrary to NMSA 1978, Section 30-31-25(A) (2001), based on the items found during Operation Yerba Buena. Davis filed two suppression motions, arguing that 1) the helicopter surveillance violated his constitutional right to be free from unreasonable searches, and 2) his consent for the subsequent search of his property was involuntary.

**{13}** Davis requested that the suppression hearing be consolidated with a suppression hearing in a separate case involving Steve Hodges, another Carson resident also charged with possession of marijuana seized from his property as part of Operation Yerba Buena. Although each defendant made additional arguments for suppression (invalid warrant by Hodges and invalid consent by Davis), both presented a similar challenge to the constitutionality of the helicopter surveillance of their property. The district court granted Davis' consolidation request and held an evidentiary hearing on the motions to suppress.

**{14}** Several Carson residents testified during the hearing, as previously discussed in this opinion. Some residents testified that the surveillance felt like an invasion with the helicopter hovering so close to the ground that the rotor wash and ground effects kicked up dust and blew debris around their property. Others focused their testimony specifically on the noise disruption from the helicopter, stating that they were unable to go outside and work or have a conversation. Still others alleged that the helicopter physically damaged their property, and recounted the damage to the solar panel and the broken support beams discussed above.

**{15}** Some of the participating officers also testified during the hearing. Sergeant Matthew Vigil, the officer in command of Operation Yerba Buena, testified that the helicopters were flown at a reasonable height above the residents' properties and stated that the pilots "were real strict on guidelines as far as altitude." When asked generally whether a helicopter ever spent "like five minutes or ten minutes over a property in an altitude of less than a hundred feet," Sergeant Vigil responded in the negative. Sergeant Vigil stated that he was unaware

4

of and did not observe any of the damage or disturbance created by the helicopter's rotor wash alleged by the individual residents.

**{16}**    Sergeant Adrian Vigil, one of the ground officers, testified that the helicopter probably came down to "a couple hundred feet" to confirm its original observations and provide the ground team with cover. He also testified that the helicopter did not go so low that it would cause interference, and said he could not feel any wash from the helicopter. Sergeant Merrell, the ground team officer in charge of the investigation at Davis' residence, gave testimony describing his encounter with Davis, and his audio recording of the encounter, including the audible noise from the hovering helicopter, was submitted into evidence.

**{17}**    After considering all testimony, exhibits, and arguments, the district court denied Davis' suppression motion and issued findings and conclusions in support of its decision. The court analyzed the facts of this case under what it characterized as the *Riley/Ciraolo* rule, a list of factors used by the United States Supreme Court to assess the constitutionality of aerial surveillance.[1] *See Florida v. Riley*, 488 U.S. 445 (1989); *California v. Ciraolo*, 476 U.S. 207 (1986).

**{18}**    According to the district court's findings, the helicopter circled over certain locations and then swooped in for closer looks. The court concluded that "[a] greater degree of intrusion is permissible if aerial surveillance is used to confirm facts, rather than flying around generally in an effort to spot greenhouses, then swooping in lower to see what could possibly be seen." But the district court was "troubled by the testimonial descriptions of rotor wash and flying debris." Although the court believed that some of the testimony was "overly dramatic and anti-police state rhetoric," it found merit to the claim that "the police swooped in as if they were in a state of war . . . [which] can be terrifying and intimidating to most normal persons."

**{19}**    Because surveillance was in response to general vague complaints, however, the district court found that "[i]t was not confirmatory activity" and "[t]he claims of dust and destruction [were] negligible, in comparison." In totality, the court concluded as a matter of law that the helicopter surveillance "just barely" made it over the threshold of validity. The district court then found that Davis' subsequent consent to the search was valid and not given under duress or coercion. The court denied both of Davis' motions to suppress.

**{20}**    Following the hearing, Davis entered a conditional plea of guilty reserving his right to appeal the district court's pretrial denial of his motion to suppress. On Davis' first appeal,

---

[1]The factors the district court considered were "[e]fforts of the [resident] to protect from aerial intrusions, presence in navigable airspace, the extent of physical intrusion, location of the property, [and] altitude and frequency and circumstances around the means of surveillance."

our Court of Appeals reversed the district court on the consent finding, concluding that the State failed to establish that Davis' consent was voluntary. *State v. Davis*, 2011-NMCA-102, ¶ 1, 150 N.M. 611, 263 P.3d 953 (*Davis I*). We granted certiorari and reversed, concluding that substantial evidence supported the district court's finding that Davis voluntarily consented to the search of his residence. *Davis II*, 2013-NMSC-028, ¶¶ 2, 34. We remanded the case to the Court of Appeals to address remaining issues. *Id.* ¶ 35.

**{21}** On remand, the Court of Appeals considered the validity of the aerial surveillance under both the U.S. and the New Mexico Constitutions. *State v. Davis*, 2014-NMCA-042, ¶ 4, 321 P.3d 955 (*Davis III*). The Court of Appeals found the surveillance permissible under the Fourth Amendment to the U.S. Constitution, but impermissible under Article II, Section 10 of the New Mexico Constitution. *Davis III*, 2014-NMCA-042, ¶¶ 1, 11, 27. As justification for its holding, the Court of Appeals stated: "The privacy interest protected by Article II, Section 10 is not limited to one's interest in a quiet and dust-free environment. It also includes an interest in freedom from visual intrusion from targeted, warrantless police aerial surveillance, no matter how quietly or cleanly the intrusion is performed." *Id.* ¶ 19.

**{22}** Having determined that the aerial surveillance was unconstitutional, the Court of Appeals then concluded that there was insufficient attenuation to purge Davis' consent from the illegal search. *Id.* ¶¶ 28-31. Reversing the district court, the Court of Appeals suppressed all evidence obtained from the Davis search. *Id.* ¶¶ 1, 32.

**{23}** We again granted the State's petition for certiorari review, *State v. Davis*, 2014-NMCERT-003, this time to determine 1) whether aerial surveillance is a violation of Article II, Section 10 of the New Mexico Constitution and, if so, 2) whether Davis' subsequent consent to search his property was sufficiently attenuated from the illegal search.

**DISCUSSION**

**Under our interstitial analysis, we must first consider whether the claimed right is protected under the U.S. Constitution before considering whether the New Mexico Constitution offers broader protection**

**{24}** When interpreting independent provisions of our New Mexico Constitution for which there are analogous provisions in the U.S. Constitution, New Mexico utilizes the interstitial approach. *State v. Gomez*, 1997-NMSC-006, ¶ 21, 122 N.M. 777, 932 P.2d 1. Under that approach, before reaching the state constitutional claim, we must first determine whether the right being asserted is protected under the Federal Constitution. *Id.* ¶ 19. If the right is protected under the Federal Constitution, our courts do not reach the state constitutional claim. *Id.* In this case, therefore, we must first determine whether the aerial surveillance conducted during Operation Yerba Buena violated the Fourth Amendment. If so, we do not address Davis' state constitutional claim.

**{25}** "The touchstone of Fourth Amendment analysis is whether a person has a

6

constitutionally protected reasonable expectation of privacy [in the area searched]," in this case the curtilage of a private home. *Ciraolo*, 476 U.S. at 211 (internal quotation marks and citation omitted). This inquiry normally embraces two discrete questions: "whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy, . . . [and] whether the individual's subjective expectation of privacy is [objectively] one that society is prepared to recognize as reasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal quotation marks and citations omitted). The determination is based on the totality of circumstances in each particular case. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

**Whether Davis had a reasonable expectation of privacy from a helicopter conducting aerial observation over the curtilage of his home**

**{26}** The curtilage of a house is considered an extension of the home for Fourth Amendment purposes. *State v. Sutton*, 1991-NMCA-073, ¶ 8, 112 N.M. 449, 816 P.2d 518, *modified on other grounds by Gomez*, 1997-NMSC-006, ¶ 32. As such, the curtilage has "long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept." *Dow Chem. Co. v. United States*, 476 U.S. 227, 235 (1986). *See also State v. Bryant*, 2008 VT 39, ¶ 13, 950 A.2d 467 ("A home's curtilage—the 'area outside the physical confines of a house into which the 'privacies of life' may extend'—merits 'the same constitutional protection from unreasonable searches and seizures as the home itself.'" (first quoting *State v. Rogers*, 638 A.2d 569, 572 (Vt. 1993); then quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984))).

**{27}** Falling within the curtilage of a home, however, does not automatically warrant protection from all observation under the Fourth Amendment. The U.S. Supreme Court has consistently maintained that the Fourth Amendment offers no protection— even within the home or curtilage—if the observed area is knowingly exposed to public view. *Kyllo v. United States*, 533 U.S. 27, 32 (2001). *See also Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *Dow Chem. Co.*, 476 U.S. at 234-35 (visual observation is no search at all). In order to claim protection under the Fourth Amendment, therefore, an individual must take affirmative steps to exhibit an expectation of privacy.

**{28}** In this case, Davis did take affirmative steps to exhibit an expectation of privacy from ground level surveillance. He fully enclosed his property with ground level "fencing," using a combination of vegetation and artificial devices. But, exhibiting a reasonable expectation of privacy from ground level surveillance may not always be enough to protect from public or official observation from the air under the Fourth Amendment. *Riley*, 488 U.S. at 450-51.

**{29}** In two cases remarkably similar to the case at bar, the U.S. Supreme Court addressed the constitutionality of warrantless aerial observation of the curtilage of a home that, like Davis', was blocked from ground-level observation but left open to observation from the air. In the first case, *California v. Ciraolo*, the police attempted to observe the backyard of a

7

private residence where marijuana was allegedly being grown. *Ciraolo*, 476 U.S. at 213. High double fences completely enclosed the yard, prohibiting all ground level observation, so officers secured a private plane and flew over the house. *Id.* at 209. From the air, the officers identified marijuana plants and photographed the plants with a standard 35 mm camera. *Id.*

{30} The U.S. Supreme Court granted certiorari to determine whether officers violated the Fourth Amendment when they observed the fenced-in backyard within the curtilage of a home from a fixed-wing aircraft at an altitude of *1,000* feet. *Id.* The Court determined there was no reasonable expectation of privacy when the observations "took place within public navigable airspace, in a physically nonintrusive manner." *Ciraolo*, 476 U.S. at 213 (internal citation omitted).

{31} In support of its holding, the Court stated "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private activity,' but instead whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id.* at 212 (alteration in original) (internal quotation marks and citation omitted).

> That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

*Ciraolo*, 476 U.S. at 213 (internal quotation marks and citations omitted).

{32} Three years later in *Florida v. Riley*, the U.S. Supreme Court again addressed aerial observation under the Fourth Amendment. 488 U.S. at 447-48. In that case, the officer utilized a helicopter to observe a targeted area. *Id.* at 448 The Court granted certiorari to determine whether warrantless surveillance of a partially covered greenhouse in a residential backyard from a helicopter *400* feet above the greenhouse constituted a search under the Fourth Amendment. *Id.* at 448.

{33} The opinion in *Riley* was badly fractured, but a majority of the Court agreed that the observation was not a search under the Fourth Amendment. *Id.* at 447, 452 (O'Connor, J., concurring). Justice White wrote an opinion for a plurality of four justices. *Id.* at 447. Following the reasoning advanced in *Ciraolo,* the plurality reiterated that:

> [T]he home and its curtilage are not necessarily protected from inspection

that involves no physical invasion. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. As a general proposition, the police may see what may be seen from a public vantage point where they have a right to be. Thus the police, like the public, would have been free to inspect the backyard garden from the street if their view had been unobstructed. They were likewise free to inspect the yard from the vantage point of an aircraft flying in the navigable airspace.

*Riley*, 488 U.S. at 449-50 (internal alterations omitted) (internal quotation marks and citations omitted). The plurality determined that the helicopter, like the airplane in *Ciraolo*, was hovering within the prescribed navigable airspace. *Riley*, 488 U.S. at 451. In making that determination, the plurality relied on Federal Aviation Administration regulations that permit helicopters to operate at less than the minimum altitude for fixed-wing aircraft, as long as the "operation is conducted without hazard to persons or property on the surface." *Id.* at 451 n.3 (internal quotation marks and citation omitted).

**{34}** Significantly for our case, the plurality emphasized that the helicopter was not violating the law, and there was no indication in the record that "the helicopter interfered with respondent's normal use of the greenhouse or of other parts of the curtilage," or caused undue noise, wind, dust, or threat of injury. *Id.* at 451-52. The plurality thus found that the police did no more than any member of the public could do flying in navigable airspace, and the Court held that the surveillance did not violate the Fourth Amendment. *Id.* at 451. Justice White cautioned, however, that not every inspection of the curtilage of a house from an aircraft will "pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law." *Id.*

**{35}** Although we avoid the temptation to draw too much settled legal principle from either of these two opinions, we believe certain inferences are appropriate. First, it appears after *Ciraolo* and *Riley* that the Fourth Amendment affords citizens no reasonable expectation of privacy from aerial surveillance conducted in a disciplined manner—mere observation from navigable airspace of an area left open to public view with minimal impact on the ground. It also seems, however, that warrantless surveillance can go beyond benign observation in a number of different ways, one of those being when surveillance creates a "hazard"—a physical disturbance on the ground or unreasonable interference with a resident's use of his property. In that case, surveillance more closely resembles a physical invasion of privacy which has always been a violation of the Fourth Amendment. *See Riley*, 488 U.S. at 449-52. *See also United States v. Jones*, __ U.S. __, __, 132 S. Ct. 945, 955 (2012) ("[A] search within the meaning of the Fourth Amendment occurs, at a minimum, '[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.'" (Sotomayor, J., concurring, quoting 132 S. Ct. at 950 n.3.) (second alteration in original)). For reasons that follow, this distinction, referenced in both *Ciraolo* and *Riley*, informs our constitutional analysis of what occurred on Davis' property.

**{36}** We do not consider this question in a vacuum. Many state courts base their

determination of whether a particular aerial surveillance violates the Fourth Amendment on the degree of physical intrusion on the ground below. In assessing intrusion, courts look at the legality of the flight, the altitude of the aircraft, the frequency and duration of the flight, and the nature of the area observed—factors similar to *Ciraolo* and *Riley* and factors employed by the district court in this very case. *See United States v. Bassford*, 601 F. Supp. 1324, 1330 (D. Me. 1985) ("[C]ourts have taken a case-by-case approach to the [F]ourth [A]mendment problems implicated by aerial surveillance [considering factors such as] the height of the aircraft, the size of the objects, the nature of the area observed, . . . the frequency of flights over the area, and the frequency and duration of the aerial surveillance." (internal citations omitted)). *See also Bryant*, 2008 VT 39, ¶¶ 23-26 ("Since the rulings in . . . *Ciraolo* and *Riley*, . . . some state courts have relied solely on the legality of a helicopter's position in public airspace to determine whether the aerial surveillance at issue was a search. . . . Some courts . . . consider the legality and intrusiveness of the surveillance flight. . . . Still other state courts attempt to give effect to all of the *Riley* opinions by evaluating legality, intrusiveness, and the frequency of flight at the altitude at which the surveillance took place. . . . A remaining group of state courts rely on a multitude of factors of their own articulation." (internal citations omitted)).

**{37}**     Consistent with the general trend of focusing on the degree of intrusiveness, our Court of Appeals over 30 years ago found no Fourth Amendment violation based partly on the district court's finding that the aerial observation was accomplished "without disturbing defendant's premises." *State v. Rogers*, 1983-NMCA-115, ¶¶ 3, 5, 100 N.M. 517, 673 P.2d 142 (internal quotation marks omitted). Although decided three years before the first of the U.S. Supreme Court opinions on aerial surveillance, the Court of Appeals' opinion in *Rogers* presaged the analysis eventually undertaken by that Court.

**{38}**     Much as with this case, *Rogers* involved aerial observation of a greenhouse within the curtilage of a home from a helicopter looking for marijuana plants. *Id.* ¶ 2. Rogers and his neighbors testified that the helicopter hovered as low as 30 feet and that the noise of the helicopter awakened them and kicked up dust. *Id.* ¶¶ 5, 12. The helicopter pilot testified, however, that the total surveillance lasted for only 15 to 30 seconds and the helicopter stayed above 100 feet, hovering over an adjacent field several hundred feet from the residence. *Id.* ¶ 12. As finder of fact, the district court found the State's witnesses persuasive. *Id.* ¶ 5. Our Court of Appeals concluded that "[w]hile the facts of this case teeter dangerously close to exceeding the limitations implicit in the Fourth Amendment, we do not believe that defendant may claim constitutional protection under these circumstances. . . . [T]he surveillance methods used by the police were not unreasonable." *Id.* ¶ 13. Substantial evidence supported the district court's finding of no disturbance to the defendant's property, and the Court of Appeals affirmed. *Id.* ¶¶ 5, 14.

**{39}**     As in *Rogers*, in most cases courts find that the aerial observation was not sufficiently intrusive as to invade a reasonable expectation of privacy, and sustain the warrantless aerial surveillance. *See, e.g.*, *People v. McKim*, 263 Cal. Rptr. 21, 25 (Ct. App. 1989) (upholding a helicopter surveillance where there was no evidence the helicopter interfered with the

defendant's use of his property or "created any undue noise, wind, dust, or threat of injury"); *Henderson v. People*, 879 P.2d 383, 389-90 (Colo. 1994) (en banc) (upholding helicopter surveillance where there was little evidence of wind, dust, threat of injury, or interference and there was no indication the neighbors felt compelled to go outside and observe the commotion); *State v. Rodal*, 985 P.2d 863, 867 (Or. Ct. App. 1999) (upholding surveillance where the helicopter was operated in a lawful and unintrusive manner).

**{40}** There are instances, however, where "the means of surveillance [were] sufficiently intrusive so as to give rise to a constitutional violation." *See* 1 Joseph G. Cook, *Constitutional Rights of the Accused* § 4:5 n.6 (3d ed. 2015). We have found two state court cases from other jurisdictions concluding that the degree of physical invasiveness from warrantless aerial surveillance amounted to an unconstitutional search under the Fourth Amendment.

**{41}** In *Commonwealth v. Oglialoro*, the Supreme Court of Pennsylvania held that aerial surveillance of a barn violated the Fourth Amendment due to the risk of harm to the resident and her property during the search. 579 A.2d 1288, 1294 (Pa. 1990). In that case, the police hovered over a barn located within the curtilage of a home at an altitude of 50 feet for "approximately 15 seconds and made a total of three or more passes over the . . . property, lasting approximately five minutes." *Id.* at 1290. The wife of the defendant testified that she was "present in the home at the time [and] experienced various sensations caused by the helicopter[']s proximity, such as loud noise, and vibration of the house and windows." *Id.* The Court stated:

> While the police had a right to fly above [defendant's] property and he had no reasonable expectation of privacy that they would not peer into his barn, it remains to be decided whether the conduct of the police in flying at 50 feet above the barn was hazardous to persons or property on the surface. If so, the search would be unreasonable . . . . When weighing the issue of whether or not a helicopter surveillance is intrusive to the point of being hazardous, or non-intrusive, a trial court should ask whether or not a risk of harm or danger exists in regards to the person(s) present or property being observed, whether or not a danger, or threat of injury exists, in regards to persons present within the area being searched.

*Id.* at 1293. There was no testimony from the police to refute the wife's testimony. *Id.* at 1294.

**{42}** The Pennsylvania Supreme Court determined under the evidence presented that the "helicopter's presence at 50 feet above the barn represented a hazard to persons and property on the ground and that the conduct of the police in flying at this level was unreasonable." *Id.* at 1294. The Court concluded that the surveillance was intrusive and that flying at that low level created a risk of harm, and noted that the police did not produce any evidence rebutting the wife's testimony or explaining why it was necessary to conduct observation from such

11

a dangerously low altitude. *Id.*

**{43}** The Colorado Court of Appeals, also finding a violation of the Fourth Amendment, held that aerial surveillance of a backyard went beyond mere observation when a helicopter 1) "descended to 200 feet," 2) "hovered in the area for several minutes," and 3) created "enough noise that numerous people ran out" to see what was happening. *People v. Pollock*, 796 P.2d 63 (Colo. Ct. App. 1990). The defendant and several neighbors testified that the helicopter was extremely noisy and that one child asked if the army was invading. *Id.* at 65.

**{44}** The Colorado Court of Appeals characterized *Pollock* as a close case but determined that two critical factors in the record distinguished *Pollock* from *Ciraolo* and *Riley*: 1) infrequency of helicopter flights at that altitude, and 2) excessive noise from the helicopter. *Pollock*, 796 P.2d at 64. The Court held that, "on this record, with unrefuted evidence, the type of which was notedly absent in both *California v. Ciraolo* and *Florida v. Riley*, . . . defendant had a reasonable expectation of privacy that no such surveillance would occur." *Id.* at 65.

**The aerial surveillance during Operation Yerba Buena in light of these Fourth Amendment cases**

**{45}** Our review of these and other cases involving aerial observation of marijuana plants, both pre- and post-*Ciraolo* and *Riley*, leads us to certain conclusions. First, unobtrusive aerial observations of space open to the public are generally permitted under the Fourth Amendment. Even a minor degree of annoyance or irritation on the ground will not change that result. If that were all that occurred in the surveillance of the Davis property, this would likely not constitute an unreasonable search under the Fourth Amendment.

**{46}** Our second conclusion, however, is that when low-flying aerial activity leads to more than just observation and actually causes an unreasonable intrusion on the ground—most commonly from an unreasonable amount of wind, dust, broken objects, noise, and sheer panic—then at some point courts are compelled to step in and require a warrant before law enforcement engages in such activity. The Fourth Amendment and its prohibition against unreasonable searches and seizures demands no less. Obviously, the line drawn between activity permitted with or without a warrant is fact-dependent; any further definition is elusive. For that reason, we must return to the evidentiary hearing conducted in this case and the resulting observations of the district court.

**{47}** Although the district court concluded as a matter of law that Operation Yerba Buena did not amount to an unconstitutional search, many of its findings and much of the evidence suggest that the police went beyond mere observation as that term has been defined by Fourth Amendment jurisprudence. The district court's findings make multiple references to the degree of noise and disturbance on the ground and suggest that the helicopter swooped down low enough to cause panic among the residents.

**{48}** In addition to the district court's findings, evidence from Davis and the other residents suggests that the officers in the helicopter did more than merely observe. There were multiple allegations regarding other properties that the helicopter caused property damage—the broken beams and the damaged solar panel—and produced excessive noise and kicked up dust and debris. The noise allegations in particular are supported by Sergeant Merrell's audio recording where the helicopter is clearly heard hovering over Davis' home. And it is clear from all testimony that the helicopters were there to do more than just observe; they were also there to provide aerial cover and protection for the officers on the ground—in other words, to participate actively in the investigation. In so doing, the police increased the risk of actual physical intrusion as occurred in this case.

**{49}** We acknowledge testimony to the contrary, primarily from law enforcement officers who were there on the ground. For example, police officers testified that the helicopter was operating at a lawful altitude and emphasized that the pilots strictly adhered to altitude guidelines. However, as the U.S. Supreme Court said in *Riley*, an observation will not always be lawful under the Fourth Amendment simply because the plane is operating within navigable airspace. *Riley*, 488 U.S. at 451. Like in *Pollock* and *Oglialoro*, the police here failed to provide testimony rebutting the specific claims of damage and disruption as described by Davis and the other residents at the suppression hearing.

**{50}** For example, Sergeant M. Vigil stated that he was *unaware* of any damage to any resident's property, and Sergeant A. Vigil stated that he did not *feel* any wash from the helicopter. Both of these accounts imply that the officers either may not have recalled or were not particularly focused on whether there was damage or wash. These vague recollections are not the type of conclusive evidence that can effectively rebut the specific allegations made by the residents. Further, and perhaps more importantly, neither Sergeant M. Vigil nor Sergeant A. Vigil was present for the surveillance of Davis' property. They were assigned to searches of properties located elsewhere in the search area.

**{51}** Regrettably for the State, Sergeant Skinner, the observer for the team that did fly over Davis' property, did not testify at the suppression hearing. Sergeant Merrell, who was also present at Davis' property, testified but did not address or refute Davis' allegations of disturbance, excessive noise, and dust. Perhaps most importantly, the district court, having personally witnessed all testimony and other evidence elicited at the suppression hearing, did not disregard the residents' testimony as not credible, did not find that the dust and disturbance never happened, and did not find that the police officers' testimony was exclusively reliable.

**{52}** Based on the evidence, therefore, we conclude that the official conduct in this case went beyond a brief flyover to gather information. The prolonged hovering close enough to the ground to cause interference with Davis' property transformed this surveillance from a lawful observation of an area left open to public view to an unconstitutional intrusion into Davis' expectation of privacy. We think what happened in this case to Davis and other persons on the ground is precisely what *did not* occur in either *Ciraolo* or *Riley* and what *did*

occur in both *Oglialoro* and *Pollock*. Accordingly, we hold that the aerial surveillance over Davis' property was an unwarranted search in violation of the Fourth Amendment.

**The New Mexico Constitution**

**{53}** Under our interstitial approach to the New Mexico Constitution as explained previously, because we find the asserted right to be protected under the Federal Constitution we do not reach the same claim under our New Mexico Constitution. In resolving this dispute on federal grounds, two consequences for the Court of Appeals' opinion become clear. First, we reverse the Court of Appeals' holding with respect to the Fourth Amendment because we find an unreasonable, unconstitutional search under the U.S. Constitution. Second, it is now unnecessary to reach the same question posed under the New Mexico Constitution, which renders the Court of Appeals' discussion of that subject moot though informative. In the end, however, we uphold the result achieved by the Court of Appeals, which is to suppress all evidence obtained from the search of Davis' property and to reverse his conviction.

**{54}** As an aside, we note that the Court of Appeals, when reviewing the district court's order in this case, suggested that when considering privacy interests under our State Constitution we move away from an intrusion analysis in anticipation of future surveillance conducted by "ultra-quiet drones" and other high-tech devices. *Davis III*, 2014-NMCA-042, ¶ 19. Because this case only involves surveillance by helicopters, technology that has been with us for nearly 80 years, we find it unnecessary to speculate about problems—and futuristic technology—that may or may not arise in the future. Instead, we reserve judgment and await a proper case with a developed record.

**Davis' consent was not sufficiently attenuated from the unconstitutional search**

**{55}** As this Court decided in *Davis II*, Davis validly consented to the search of his home and greenhouse after Sergeant Merrell informed him that a helicopter spotter had identified marijuana plants growing on his property. 2013-NMSC-028, ¶¶ 19-20, 35. However, having now determined that the helicopter flyover was an illegal search, we are left to decide whether Sergeant Merrell obtained Davis' consent by means "sufficiently distinguishable to be purged of the primary taint of the illegal helicopter surveillance." *Davis III*, 2014-NMCA-042, ¶ 30 (internal quotation marks and citation omitted).

**{56}** "The fruit of the poisonous tree doctrine bar[s] the admission of legally obtained evidence derived from past police illegalities." *State v. Monteleone*, 2005-NMCA-129, ¶ 16, 138 N.M. 544, 123 P.3d 777 (alteration in original) (internal quotation marks and citation omitted). "In order for evidence obtained after an illegality, but with the voluntary consent of the defendant, to be admissible, there must be a break in the causal chain from the [illegality] to the search[.]" *State v. Taylor*, 1999-NMCA-022, ¶ 28, 126 N.M. 569, 973 P.2d 246 (alterations in original) (internal quotation marks and citation omitted), *overruled on other grounds by State v. Leyva*, 2011-NMSC-009, ¶ 17 n.1, 149 N.M. 435, 250 P.3d 861.

"In deciding whether the consent is sufficiently attenuated from the Fourth Amendment violation, we consider the temporal proximity of the illegal act and the consent, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct." *Taylor*, 1999-NMCA-022, ¶ 28.

**{57}** In this case, Sergeant Merrell's contact with Davis and his subsequent request to search Davis' greenhouse were made in direct response to, and simultaneously with, the information provided by the helicopter spotter, information obtained as a result of the illegal helicopter search. Sergeant Merrell told Davis that "the helicopter . . . [was] looking for marijuana plants and they believe they've located some at your residence." Sergeant Merrell then asked Davis for permission to search his property.

**{58}** Further, the helicopter was present and was continuing to provide information to Sergeant Merrell as Sergeant Merrell approached Davis. The helicopter is clearly audible on Sergeant Merrell's belt tape during his discussion with Davis and remained over the house until Davis gave verbal consent to search his property.

**{59}** We affirm the Court of Appeals' determination that Sergeant Merrell entered "[Davis'] property solely as a result of information obtained in the helicopter search," and there were no "intervening circumstances between the aerial search and [Davis'] consent." *Davis III*, 2014-NMCA-042, ¶ 31. As a result we hold that there was insufficient attenuation to purge Davis' consent of the taint resulting from the warrantless aerial search.

## CONCLUSION

**{60}** For the foregoing reasons we hold that this aerial surveillance amounted to an unconstitutional search under the Fourth Amendment and reverse the Court of Appeals' determination to the contrary. We affirm the ultimate determination of the Court of Appeals to suppress all evidence seized as a result and reverse the conviction in this case.

**{61}** **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice, specially concurring**

_____

15

**CHARLES W. DANIELS, Justice**

**CHÁVEZ, Justice, specially concurring.**

**{62}**    I concur in the result of the majority opinion which suppresses the evidence in this case, but I respectfully disagree with the analysis employed by the majority.  In this case, law enforcement officers conducted an indiscriminate aerial surveillance over large areas in Taos County based on outdated, vague reports from anonymous sources whose reliability is unknown, that some undisclosed people were growing marijuana in unspecified locations. Utilizing helicopters for aerial surveillance, the law enforcement officers swooped down on house after house, including Defendant's house, as if the occupants did not have an expectation of privacy in and around their homes.  The district court believed "that the police swooped in as if they were in a state of war, searching for weapons or terrorist activity," which "can be terrifying and intimidating to most normal persons."  The majority concludes that people would not have a reasonable expectation of privacy in their homes and curtilage[2] from aerial surveillance as long as during the surveillance law enforcement is disciplined enough not to be too noisy, kick up too much dust, cause too much wind, or otherwise unduly interfere with the owners' or occupants' use of the property.  Majority op. ¶¶ 35, 36, 45, 46.  In this case the majority concludes that the law enforcement officers were not disciplined enough, and they therefore violated Defendant's Fourth Amendment rights, requiring suppression of the evidence.

**{63}**    Unlike the majority, I doubt that Defendant has a protected privacy interest under the Fourth Amendment of the United States Constitution, and I therefore would analyze this case under Article II, Section 10 of the New Mexico Constitution.  I would hold that an individual's subjective expectation of privacy in his or her home from ground-level surveillance is coextensive with his or her subjective expectation of privacy from aerial surveillance.  If an individual has taken steps to ward off inspection from the ground, the individual has also manifested an expectation to ward off inspection from the air.

**{64}**    I would decline to follow the flawed analysis of the federal courts.  Whether an individual has a reasonable expectation of privacy in his or her home and curtilage should not turn on whether the government's invasion is too noisy or kicked up too much dust. Equally unilluminating criteria such as whether the altitude of the aircraft is in compliance with Federal Aviation Administration (FAA) regulations or the regularity of flights over an individual's home should also be rejected.  FAA regulations address safety concerns, not privacy concerns.  In addition, to suggest that in New Mexico privately owned helicopters or other aircraft regularly fly at the altitudes that the helicopters in this case were flown strains credulity.  In any event, members of the public utilize airspace for travel, not to

---

[2]"Generally, the curtilage is the enclosed space of the grounds and buildings immediately surrounding a dwelling house."  *State v. Hamilton*, 2012-NMCA-115, ¶ 16, 290 P.3d 271 (internal quotation marks and citation omitted).

intently scrutinize other peoples' residential yards; at most, such travelers only gain a fleeting glimpse of a property owner's backyard. The New Mexico Constitution should not be interpreted to give the government the authority to conduct an aerial surveillance over a property owner's home and curtilage when the owner has taken steps to exhibit an expectation of privacy in those areas, unless the government complies with the warrant requirement—a requirement that we have carefully guarded for at least the last quarter of a century.

**{65}** New Mexico covers a large geographic area, almost 122,000 square miles, and much of it is rural. People living in rural communities enjoy the absence of noise and light pollution. To be clear, they have a heightened expectation of privacy. Our courts have acknowledged as much since at least 1991. *See State v. Sutton*, 1991-NMCA-073, ¶ 24, 112 N.M. 449, 816 P.2d 518 (concluding that the prevalence of large rural lots and plentiful land has given rise to uniquely heightened expectations of privacy in the homes and curtilages of our citizens), *holding modified on other grounds by State v. Gomez*, 1997-NMSC-006, 122 N.M. 777, 932 P.2d 1.

**{66}** I would hold that in New Mexico, when a property owner takes steps to exhibit a subjective expectation of privacy from ground-level observations into the curtilage of his or her property, society would recognize the owner's subjective expectation of privacy from aerial observations as reasonable. Under such circumstances, pursuant to Article II, Section 10 of the New Mexico Constitution, before law enforcement officers may conduct an aerial surveillance, they must obtain a search warrant or have some recognized exception to the warrant requirement. The interest protected by Article II, Section 10 is the privacy interest of all citizens, including law-abiding citizens, and a citizen's privacy interest is not diminished if a search uncovers evidence of a crime.[3]

**A.** **Article II, Section 10 of the New Mexico Constitution provides greater privacy protections than the Fourth Amendment of the United States Constitution against the government-initiated aerial surveillance of Defendant's property**

**{67}** The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Similarly, Article II, Section 10 of the New Mexico Constitution guarantees that "[t]he people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures."

**{68}** "Because both the United States and the New Mexico Constitutions provide

---

[3]*See, e.g.*, *State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 18, 130 N.M. 386, 25 P.3d 225 (noting that Article II, Section 10 embodies "the fundamental notion that *every* person in this state is entitled to be free from unwarranted governmental intrusion" (emphasis added) (internal quotation marks and citations omitted)).

17

overlapping protections against unreasonable searches and seizures, we apply our interstitial approach." *State v. Ketelson*, 2011-NMSC-023, ¶ 10, 150 N.M. 137, 257 P.3d 957 (internal quotation marks and citations omitted). Under our interstitial approach, "we first consider whether the right being asserted is protected under the federal constitution." *Id.* (internal quotation marks and citation omitted). "If the right is protected by the federal constitution, then the state constitutional claim is not reached." *Id.*; *see also State v. Jean-Paul*, 2013-NMCA-032, ¶ 5, 295 P.3d 1072 ("Under New Mexico's interstitial approach to state constitutional interpretation, this Court should only reach the state constitutional question if the federal constitution does not provide the protection sought by the party raising the issue."). If the right is not protected by the federal constitution, "we next consider whether the New Mexico Constitution provides broader protection, and we may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Ketelson*, 2011-NMSC-023, ¶ 10 (internal quotation marks and citation omitted). For the reasons that follow, I cannot agree with the majority that the Fourth Amendment protects Defendant's reasonable expectation of privacy from government aerial surveillance.

**1.      *Defendant's expectation of privacy against aerial surveillance is likely not protected by the Fourth Amendment***

**{69}**     "In determining whether a particular form of government-initiated . . . surveillance is a 'search' within the meaning of the Fourth Amendment," *Smith v. Maryland*, 442 U.S. 735, 739 (1979), the United States Supreme Court adopted a two-prong test that was first articulated in Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), *limitation of holding recognized by United States v. Oliver*, 686 F.2d 356, 359-60 (6th Cir. 1982). *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). Under this two-prong test, courts must first determine "whether the individual, by his [or her] conduct, has 'exhibited an actual (subjective) expectation of privacy.' " *Id.* (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). If the individual exhibited a subjective expectation of privacy, courts next determine "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.' " *Id.* (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring) (internal quotation marks omitted)).

**{70}**     United States Supreme Court precedent establishes that a defendant does not have a reasonable expectation of privacy under the Fourth Amendment if the aerial surveillance of a home and its curtilage is conducted within navigable airspace, in a non-intrusive manner, using commercially available technology, and the aerial surveillance reveals something that the defendant has not protected from aerial scrutiny. The Court first analyzed the constitutionality of aerial surveillance in *Dow Chemical Co. v. United States*, 476 U.S. 227, 229 (1986), where the Environmental Protection Agency, without Dow's consent, contracted with a commercial aerial photographer to provide images of a 2,000-acre Dow manufacturing facility from altitudes of 1,200 feet, 3,000 feet, and 12,000 feet.

18

**{71}** The Court first noted that "Dow plainly ha[d] a reasonable, legitimate, and objective expectation of privacy within the interior of its covered buildings, and it is equally clear that expectation is one society is prepared to observe." *Id.* at 236. However, the Court reasoned that the "intimate activities associated with family privacy and the home and its curtilage simply do not reach the outdoor areas or spaces between structures and buildings of a manufacturing plant." *Id.* The Court reasoned that the open areas in the 2,000-acre industrial facility were more akin to an open field than to the curtilage of a home, *id.* at 235-36, and as a result, were "open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras." *Id.* at 239. Accordingly, the Court held that "the taking of aerial photographs of an industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment." *Id.*

**{72}** In a second opinion filed on the same day the Court decided *Dow*, the United States Supreme Court also decided *California v. Ciraolo*, a case where police conducted an aerial surveillance operation after they received a tip regarding backyard marijuana cultivation on the defendant's property. 476 U.S. 207, 209 (1986). After finding that the high fencing surrounding the defendant's yard obstructed their view from the street, the police obtained a small airplane and flew over the residence at an altitude of 1,000 feet. *Id.* The police officers in the airplane observed and photographed what they concluded to be marijuana plants growing in the defendant's backyard. *Id.* This evidence was used to obtain a search warrant to seize the marijuana plants. *Id.* at 209-10.

**{73}** The Court reasoned that although the presence of a ten-foot fence clearly conveyed a "desire to maintain privacy," and indeed, it successfully did so "as far as the normal sidewalk traffic was concerned," the marijuana plants might well have been visible from "the top of a truck or a two-level bus." *Id.* at 211. Under the second prong of the *Katz* test, the Court reasoned that "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Id.* at 213. As a result, the Court concluded that "the mere fact that an individual has taken measures to restrict some views of his [or her] activities [does not] preclude an officer's observations from a public vantage point where he [or she] has a right to be and which renders the activities clearly visible." *Id.* Because the observations were made from "public navigable airspace in a physically nonintrusive manner," *id.* (citation omitted), the Court held that the defendant's expectation of privacy from such aerial observations was not one "that society is prepared to honor," *id.* at 213-14 ("Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed.").

**{74}** The dissent written by Justice Powell took issue with the majority's sole reliance "on the fact that members of the public fly in planes and may look down at homes as they fly over them." *Id.* at 223 (Powell, J., dissenting). Justice Powell observed that this reasoning was flawed because "the actual risk to privacy from commercial or pleasure aircraft is virtually nonexistent. Travelers on commercial flights, as well as private planes used for

19

business or personal reasons, normally obtain at most a fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass." *Id.*

**{75}** Nearly three years after *Ciraolo*, the Court again addressed the constitutionality of government-initiated aerial surveillance operations in *Florida v. Riley*, 488 U.S. 445 (1989). *Riley* arose from a tip to police involving marijuana cultivation in a greenhouse located behind the defendant's house where the plants could not be seen from the street. *Id.* at 447-48. The aerial observations were made from a helicopter at an altitude of 400 feet, which allowed the police officers to see marijuana plants through openings in the roof and sides of the greenhouse. *Id.* at 448. In a fractured opinion, the majority of the justices in *Riley* concluded that these observations were constitutional. *Id.* at 452.

**{76}** Writing for the plurality, Justice White acknowledged that the defendant had a subjective expectation of privacy because "the precautions he took protected against ground-level observation." *Id.* at 450. However, Justice White concluded that the defendant's subjective expectation of privacy was not reasonable because "the sides and roof of his greenhouse were left partially open," and "what was growing in the greenhouse was subject to viewing from the air." *Id.* Justice White reasoned that the defendant "could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter had it been flying within the navigable airspace for fixed-wing aircraft." *Id.* at 450-51. Justice White noted that the Court "would have a different case if flying at that altitude had been contrary to law or regulation." *Id.* at 451. Justice White also concluded that it was important that "no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury." *Id.* at 452.

**{77}** Justice O'Connor's concurrence raised concerns about relying only upon compliance with FAA regulations as a litmus test for an individual's privacy interest against government-initiated aerial surveillance. *Id.* at 452-53 (O'Connor, J., concurring). Justice O'Connor instead reasoned that "consistent with *Katz*, we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that [the defendant's] expectation of privacy from aerial observation was not 'one that society is prepared to recognize as reasonable.' " *Id.* at 454 (O'Connor, J., concurring) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring) (internal quotation marks omitted)). Justice O'Connor concluded that because there is "considerable public use of airspace at altitudes of 400 feet and above," the defendant did not have a reasonable expectation of privacy from "naked-eye aerial observation from that altitude." *Id.* at 455 (O'Connor, J., concurring). However, Justice O'Connor also cautioned that "public use of altitudes lower than that—particularly public observations from helicopters circling over the curtilage of a home—may be sufficiently rare that police surveillance from such altitudes would violate reasonable expectations of privacy, despite compliance with FAA air safety regulations." *Id.* (O'Connor, J., concurring).

**{78}** Justice Brennan's dissent similarly took issue with tying an individual's privacy

interest to FAA flight safety regulations, stating that "[i]t is a curious notion that the reach of the Fourth Amendment can be so largely defined by administrative regulations issued for purposes of flight safety." *Id.* at 458 (Brennan, J., dissenting). To Justice Brennan, the question was not whether the flights were in compliance with the FAA regulations, "but whether public observation of [the defendant]'s curtilage was so commonplace that [the defendant]'s expectation of privacy in his backyard could not be considered reasonable." *Id.* at 460 (Brennan, J., dissenting). In answering this question, Justice Brennan departed from Justice O'Connor's conclusion, and he noted that while privately-owned helicopters occasionally fly over populated areas at 400 feet, "such flights are a rarity." *Id.* at 465 (Brennan, J., dissenting). Justice Brennan attributed this observation in part on the fact that the police officer's "ability to see over [the defendant]'s fence depended on his [or her] use of a very expensive and sophisticated piece of machinery to which few ordinary citizens have access." *Id.* at 460 (Brennan, J., dissenting). Justice Blackmun's dissent also cited the rarity of helicopter overflights at 400 feet, and he therefore reasoned that the prosecution should have the burden of proving that the defendant lacked a reasonable expectation of privacy "for any helicopter surveillance case in which the flight occurred below 1,000 feet." *Id.* at 468 (Blackmun, J., dissenting).

**{79}** Under the leading federal precedent, it is questionable whether Defendant in this case has a protected privacy interest under the Fourth Amendment. Although I agree with the majority that Defendant exhibited a subjective expectation of privacy under the first prong of the two-prong test in *Katz*, majority op. ¶ 28, it is questionable whether Defendant's "subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.' " *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 361 (internal quotation marks omitted)).

**{80}** Concerning Defendant's subjective expectation of privacy, I first note that Defendant's property is located in a remote area of Carson Estates in Taos County which, as the district court found, "is accessed by poorly maintained dirt roads with few directional signs." The evidence introduced during the hearing on Defendant's motion to suppress indicates that Defendant constructed the greenhouse in question at a distance from the single dirt road into his property, which runs parallel to his southern property line. The evidence also indicates that Defendant posted three signs at the only entrance into his property that read "Caveman Way Private Road," "No trespassing," and "Beware of Dog," and he erected two fences that extended 12 feet to the east and west of the driveway along his southern property line. In addition to the two fences and several large trees and bushes obstructing the view of Defendant's greenhouse from the dirt road, the evidence presented at the suppression hearing indicated that he constructed a garden with a shade screen along the southern wall of the greenhouse, and he covered the north wall of the greenhouse with black plastic. Unlike *Ciraolo*, where the marijuana plants might well have been visible from "the top of a truck or a two-level bus," 476 U.S. at 211, the evidence presented at Defendant's suppression hearing substantially supports the district court's finding that "[t]he overwhelming volume of testimony is that one could not see into the greenhouse[] from the ground."

21

**{81}** In addition, the district court was not convinced that the State Police officers were able to definitively see into the greenhouse from the helicopter. This finding is attributed to the fact that Defendant covered the roof of his greenhouse with opaque plastic, which the district court found "is described at best as translucent, though light and dark may be distinguished, but only as a pattern of shadows and light." Unlike *Riley*, there is no evidence of openings in the opaque plastic covering the ceiling of Defendant's greenhouse. Because no photographs of the greenhouse were taken from the helicopter, the State presented testimony suggesting that the spotter in the helicopter could easily see marijuana plants inside Defendant's greenhouse because the plants pressed up against the ceiling and filled the entire greenhouse. However, although the spotter reported seeing plants growing in back of the greenhouse (which actually were corn, sunflowers, and echinacea plants) and a greenhouse with vegetation, the spotter never confirmed any marijuana sightings. In addition, photographs taken by Sergeant Merrell of the interior of Defendant's greenhouse during the State Police search do not support the State's assertion that marijuana plants were pressed up against the ceiling of the greenhouse. In fact, when presented with these photographs during the suppression hearing, Sergeant Merrell conceded that none of them shows marijuana plants pressing up against the ceiling and filling Defendant's entire greenhouse.

**{82}** This evidence supports the district court's findings that "[w]ith the unaided eye it is not likely that anything other than a belief that it was marijuana was possible" and that "the visibility of 'suspected marijuana' plants inside the greenhouse[] is improbable." Accordingly, I conclude that Defendant took steps that exhibited a subjective expectation of privacy under the Fourth Amendment.

**{83}** However, under the second prong in the *Katz* test, it is questionable whether the United States Supreme Court would conclude that Defendant's "subjective expectation of privacy is 'one that society is prepared to recognize as reasonable' " under the Fourth Amendment. *Smith*, 422 U.S. at 740 (quoting *Katz*, 389 U.S. at 361 (internal quotation marks omitted)). First, although the district court found suspect "[t]he testimony that naked eye examination from 500 feet revealed marijuana plants" and the spotter in the helicopter "probably had to get closer to try to see what he was seeing from afar," the district court ultimately concluded that "[t]his factor does not weigh against the police surveillance, standing alone." The district court found "no competent evidence that the police were violating flight laws" because "[t]he FAA permits much lower flight by helicopter than by fixed wing" aircraft. *See* 14 C.F.R. § 91.119(d)(1) (1996) ("If the operation is conducted without hazard to persons or property on the surface . . . [a] helicopter may be operated at less than the minimums prescribed in paragraph (b) or (c) of this section . . . .").

**{84}** Second, the district court was "troubled by the testimonial descriptions of rotor wash and flying debris" relevant to the intrusiveness of the operation. Defendant's neighbors testified that the helicopter "frightened and annoyed" them and the downdraft created by the helicopter lifted a solar panel off a roof and blew trash all over neighboring front yards. However, Sergeant Adrian Vigil, who was in charge of supervising portions of the operation,

testified that the helicopter team is trained to hover at a high enough altitude to avoid picking up rotor wash and flying debris that would create a dangerous situation for the ground teams. The district court found that some of the testimony by Defendant's neighbors was "overly dramatic and anti-police state rhetoric," but the court also "believe[d] that there is merit to the claim that the police swooped in as if they were in a state of war, searching for weapons or terrorist activity." The district court ultimately concluded that "[t]he claims of dust and destruction [were] negligible, in comparison" to the heightened degree of intrusion created by aerial surveillance "in response to general vague complaints." Nevertheless, apart from "negligible" claims of dust and destruction, the district court found that the aerial surveillance did not interfere with Defendant's use of his greenhouse. *Cf. Riley*, 488 U.S. at 452 (determining that a surveillance helicopter did not interfere with using a greenhouse to grow marijuana in ultimately holding that aerial surveillance was not a search under the Fourth Amendment).

**{85}** Finally, the district court found that the spotter in the helicopter "was not using optical enhancements like binoculars." Although the operation's procedures required helicopter spotters to "utilize optic devices in the course of locating marijuana plantations," the helicopter that provided aerial surveillance on Defendant's property did not have such devices installed. Because the State Police spotter made a naked-eye observation of Defendant's property, the district court's finding on this factor favors the State, although I note that the helicopter spotter's sightings of allegedly suspicious plants growing outside the greenhouse and allegedly suspicious vegetation growing inside the greenhouse were either incorrect or improbable.

**{86}** Although the aerial surveillance sightings over Defendant's property were incorrect or improbable, the district court found that the surveillance was conducted within navigable airspace and in a negligibly intrusive manner, which makes it questionable whether Defendant has a protected privacy interest under the Fourth Amendment. Because "there is serious uncertainty regarding whether the United State Supreme Court would suppress the evidence in this case under the Fourth Amendment's protections against unreasonable searches and seizures," *State v. Garcia*, 2009-NMSC-046, ¶ 25, 147 N.M. 134, 217 P.3d 1032, "we turn to Article II, Section 10 to resolve this issue." *State v. Paul T.*, 1999-NMSC-037, ¶ 12, 128 N.M. 360, 993 P.2d 74 ("Because of this gap in Fourth Amendment jurisprudence, together with the possibility that the Fourth Amendment does not protect [the defendant] in the circumstances of this case, we turn to Article II, Section 10 to resolve the issue . . . .").

2.     *Defendant has a protected privacy interest against aerial surveillance under Article II, Section 10*

**{87}** "When interpreting Article II, Section 10, the New Mexico Supreme Court has emphasized its strong belief in the protection of individual privacy . . . ." *State v. Granville*, 2006-NMCA-098, ¶ 19, 140 N.M. 345, 142 P.3d 933. "Accordingly, New Mexico courts have long held that Article II, Section 10 provides greater protection of individual privacy

than the Fourth Amendment." *State v. Crane*, 2014-NMSC-026, ¶ 16, 329 P.3d 689; *State v. Leyva*, 2011-NMSC-009, ¶ 51, 149 N.M. 435, 250 P.3d 861 ("It is well-established that Article II, Section 10 provides more protection against unreasonable searches and seizures than the Fourth Amendment.").

**{88}** In light of the New Mexico Constitution's strong belief in the protection of individual privacy, "[t]he foremost distinct state characteristic upon which this Court has elaborated New Mexico's search and seizure jurisprudence under Article II, Section 10 is 'a strong preference for warrants.' " *Crane*, 2014-NMSC-026, ¶ 16 (quoting *Gomez*, 1997-NMSC-006, ¶ 36). This Court "has emphasized New Mexico's strong preference for warrants in order to preserve the values of privacy and sanctity of the home that are embodied by" Article II, Section 10. *Granville*, 2006-NMCA-098, ¶ 24. Because an individual's " 'curtilage is the area to which extends the intimate activity associated with the sanctity of a . . . home and the privacies of life,' " it enjoys the same privacy protections of the home. *State v. Hamilton*, 2012-NMCA-115, ¶ 16, 290 P.3d 271 (citations omitted).

**{89}** We premise our strong preference for warrants on the basic principle that a "judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime." *Gomez*, 1997-NMSC-006, ¶ 36 (internal quotation marks and citations omitted). Based on our strong preference for warrants, I would depart from federal jurisprudence and hold that Article II, Section 10 of the New Mexico Constitution provides greater protection than the Fourth Amendment of the United States Constitution against government-initiated aerial surveillance over an individual's home and curtilage.

**{90}** To begin the analysis, a court must apply the two-prong test set out in *Katz* to the facts of this case. First, did Defendant exhibit an actual subjective expectation of privacy, and second, was Defendant's subjective expectation of privacy " 'one that society is prepared to recognize as reasonable.' " *Crane*, 2014-NMSC-026, ¶ 18 (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). Under the first prong, courts address which steps an individual must take to manifest a subjective expectation of privacy from aerial surveillance. *Id.* I would hold that an individual's subjective expectation of privacy from *ground-level* surveillance is *coextensive* with his or her subjective expectation of privacy from *aerial* surveillance. If an individual has taken steps to ward off inspection *from the ground*, the individual has also manifested an expectation that the visibility of his or her property that he or she sought to block off from the ground *should also be private when seen from the air*. This is because members of the general public generally do not intently scrutinize other peoples' curtilages, even when they do fly over private property. *Riley*, 488 U.S. at 460 (Brennan, J., dissenting) (noting that an officer "positioned 400 feet above [the defendant's] backyard" enjoyed a vantage point that "was not one any citizen could readily share"); *see also Ciraolo*, 476 U.S. at 223-24 (Powell, J., dissenting) ("[T]he actual risk to privacy from commercial or pleasure aircraft is virtually nonexistent. Travelers on commercial flights, as well as private planes used for business or personal reasons, normally obtain at most a

24

fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass. The risk that a passenger on such a plane might observe private activities, and might connect those activities with particular people, is simply too trivial to protect against. It is no accident that, as a matter of common experience, many people build fences around their residential areas, but few build roofs over their backyards." (footnote omitted)). Instead, aerial surveillance is usually conducted with "expensive" equipment by police officers. *See Riley*, 488 U.S. at 460 (Brennan, J., dissenting). Thus, in most situations, an individual who desires complete privacy on his or her property can usually establish such privacy by *merely* taking steps to ward off *ground-level surveillance* because aerial surveillance usually is conducted only by law enforcement personnel, and not by the general public.

**{91}** This holding acknowledges that "even individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards *without entirely giving up their enjoyment of those areas*." *Riley*, 488 U.S. at 454 (O'Connor, J., concurring) (emphasis added). I would refuse to require individuals to give up enjoyment of their curtilage areas so as to manifest a subjective expectation of privacy from aerial surveillance "that society is prepared to recognize as reasonable." *Katz*, 389 U.S. at 361 (Harlan, J., concurring) (internal quotation marks omitted). A contrary holding would require individuals to roof their backyards and "encourage the transformation of our open society into a garrison state, [where] each individual [is] obsessed with shielding private activities in presumptively private areas from all possible observation." *People v. Cook*, 710 P.2d 299, 305 (Cal. 1985). Moreover, measures to block off curtilages from aerial view would generate "intangible cost[s] of shutting out the sunlight and fresh air which gives such . . . space[s their] precious character." *Id.*

**{92}** Applying the first *Katz* prong to the facts in this case, I conclude that the evidence presented during the motion to suppress hearing establishes that Defendant held a subjective expectation of privacy from aerial surveillance because of the steps he took to ward off ground-level surveillance. Defendant chose to live in a remote area of Carson Estates in Taos County, an area difficult to access due to "poorly maintained dirt roads with few directional signs or markings." Moreover, the evidence presented at the motion to suppress hearing indicates that Defendant posted signs and erected fencing at the single entrance into his property which notified any passersby of his expectations of privacy. The evidence also indicates that Defendant constructed a garden with a shade screen along the southern wall of his greenhouse and covered the north wall of his greenhouse with black plastic. This evidence substantially supports the district court's finding that "[t]he overwhelming volume of testimony is that one could not see into the greenhouse[] *from the ground*." Based on this evidence, we hold that the Defendant took sufficient steps to exhibit a subjective expectation of privacy from ground-level observation, and therefore from aerial surveillance as well.

**{93}** The second prong of the *Katz* test requires a court to determine whether Defendant's subjective expectation of privacy is one that society is prepared to recognize as reasonable.

25

Only two New Mexico cases have evaluated the second prong to determine the constitutionality of government-initiated aerial surveillance. *See generally State v. Rogers*, 1983-NMCA-115, 100 N.M. 517, 673 P.2d 142; *State v. Bigler*, 1983-NMCA-114, 100 N.M. 515, 673 P.2d 140. As *State v. Davis* (*Davis III*) recognized, both of these cases were decided before we began interpreting Article II, Section 10 more broadly than the Fourth Amendment. 2014-NMCA-042, ¶ 16, 321 P.3d 955. *Rogers* and *Bigler* appeared to anticipate the multi-factored analysis taken in *Dow*, *Ciraolo*, and *Riley* and focused on the aircraft's altitude, what aspects of the curtilage were openly visible to the public from the air, and the regularity of public flights over the defendant's property. *See Rogers*, 1983-NMCA-115, ¶¶ 7, 9 (holding that the "defendant did not have a justifiable expectation of privacy with respect to marijuana plants protruding through holes in his greenhouse roof to the extent of their visibility from the air" by focusing on the "altitude of the aircraft, use of equipment to enhance the observation, frequency of other flights and intensity of the surveillance"); *Bigler*, 1983-NMCA-114, ¶¶ 8-9 (holding that the defendant had no reasonable expectation of privacy in his marijuana crop to the extent it was visible from the air because, among other considerations, the "defendant's property [lay] within two or three miles of a municipal airport and the fact that crop dusters [flew] in the area at will").

{94} These factors are not helpful in determining whether an individual's subjective expectation of privacy from aerial surveillance is recognized as reasonable under Article II, Section 10. First, the altitude at which an aircraft may be operated is governed by the FAA's flight regulations under 14 C.F.R. Section 91.119. In an aspect that is relevant to this case, helicopters may operate at lower altitudes than the minimums prescribed in Section 91.119(b)-(c) "[i]f the operation is conducted without hazard to persons or property on the surface." 14 C.F.R. § 91.119(d)(1). The plain language of these flight regulations concerns physical safety, not whether an individual has a reasonable expectation of privacy in his or her home and curtilage. *See id.*; *cf. Riley*, 488 U.S. at 453 (O'Connor, J., concurring) ("[T]here is no reason to assume that compliance with FAA regulations alone determines whether the government's intrusion infringes upon the person and societal values protected by the Fourth Amendment." (internal quotation marks and citations omitted)).

{95} Individuals "likely expect that law enforcement personnel as well as other air travelers will abide by safety rules and other applicable laws and regulations when flying over their homes," but simply abiding by these regulations is not "an adequate test of whether government surveillance from that same spot is constitutional." *State v. Bryant*, 2008 VT 39, ¶ 28, 950 A.2d 467; *see also Crane*, 2014-NMSC-026, ¶¶ 26-27 (refusing to guide its constitutional analysis by conflicting public ordinances that regulate the manner in which household trash is collected and disposed of in New Mexico).

> Because FAA regulations allow helicopters to fly at any altitude "if the operation is conducted *without hazard to person or property on the surface*," 14 C.F.R. § 91.119, the inevitable result of this reasoning—in the absence of more restrictive state aviation laws—is that the *dangerousness* of police surveillance may become the yardstick by which constitutional privacy

26

protection is measured.

*Bryant*, 2008 VT 39, ¶ 23 (first emphasis added).  As a result, I decline to utilize an aircraft's altitude to evaluate the constitutionality of government-initiated aerial surveillance.

**{96}**   The factor analyzing what is openly visible in a curtilage from the air is similarly not helpful, regardless of whether the aircraft was flying within navigable airspace or whether its occupants were utilizing optical equipment.  If courts were to analyze what was openly visible from the air, individuals may be induced to "completely cover and enclose their curtilage."  *Riley*, 488 U.S. at 454 (O'Connor, J., concurring).  These "precautions" would exceed the measures "customarily taken by those seeking privacy."  *Id.* (O'Connor, J., concurring) (internal quotation marks and citation omitted).  Article II, Section 10 does not require the residents of this state to employ extraordinary means to maintain their constitutional privacy rights.  *See* N.M. Const. art. II, § 10; *cf.* 1 Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment* § 2.6(c), at 898-99 (5th ed. 2012) ("It would be a perversion of *Katz* to interpret it as extending protection only to those who resort to extraordinary means to keep information regarding their personal lives out of the hands of the police.").  We also note that the measures required to cut off aerial views would entail "considerable monetary expense."  *Cook*, 710 P.2d at 305.  Thus, a criterion that focuses on what is openly visible would imply that individuals who have greater financial resources would possess a greater expectation of privacy than others who do not; the protections of the New Mexico Constitution should not vary with an individual's financial resources.  *See Crane*, 2014-NMSC-026, ¶ 28.

**{97}**   I also would decline to utilize the regularity of flights over an individual's home or its proximity to an airport to inform our constitutional analysis under Article II, Section 10.  Neither *Rogers* nor *Bigler* addressed the difference between government-initiated overflights and those made by members of the general public.  *See Rogers*, 1983-NMCA-115, ¶ 6 ("[A]ir traffic is not uncommon in the area, although the town apparently does not lie below any prescribed air corridor.  Defendant and one of his neighbors on occasion had seen aircraft, including helicopters, in the area."); *Bigler*, 1983-NMCA-114, ¶ 8 ("The fact that defendant's property lies within two or three miles of a municipal airport and the fact that crop dusters fly in the area at will also support the trial court's finding that he had no reasonable expectation of privacy in his field to the extent of [its] visibility from the air.").  There is a "qualitative difference between police surveillance and other uses made of the airspace.  Members of the public use the airspace for travel, business, or pleasure, not for the purpose of observing activities taking place within residential yards."  *Ciraolo*, 476 U.S. at 224 (Powell, J., dissenting).  As Justice Brennan observed in *Riley*, the ability of the State Police to see on to a defendant's property "depended on [their] use of a very expensive and sophisticated piece of machinery to which few ordinary citizens have access."  488 U.S. at 460 (Brennan, J., dissenting).  The factors of flight regularity and airport proximity fail to comport with our recognition that "Article II, Section 10, protects citizens from governmental intrusions, not intrusions from members of the general public."  *Granville*, 2006-NMCA-098, ¶ 29.

**{98}** Furthermore, I agree with Justice Powell's dissent in *Ciraolo* and also conclude that any actual risk to privacy from commercial or private aircraft is tenuous at best. *See* 476 U.S. at 223 (Powell, J., dissenting). "[T]he actual risk to privacy from commercial or pleasure aircraft is virtually nonexistent. Travelers on commercial flights, as well as private planes used for business or personal reasons, normally obtain at most a fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass." *Id.* (footnote omitted). "One's yard may unavoidably be exposed to casual glances from passing aircraft, but he [or she] may still reasonably assume that it will not be intently examined by government agents who are flying over it for that specific purpose." *Cook*, 710 P.2d at 304 (footnote omitted). Accordingly, I also reject using the regularity of overflights and a property's proximity to an airport to inform our constitutional analysis.

**{99}** The Court of Appeals also rejected these factors. *See Davis III*, 2014-NMCA-042, ¶¶ 18-20. The Court of Appeals was understandably concerned with the likelihood that "ultra-quiet drones will soon be used commercially and, possibly, for domestic surveillance," *id.* ¶ 19, and that "[s]uch advances in technology demonstrate the increasingly diminished relevance of intrusiveness factors, as courts have regarded them in the past, in the analysis of what constitutes a search." *Id.* As a result, the Court of Appeals adopted the following test to determine whether aerial surveillance constitutes a search under Article II, Section 10:

> [I]f law enforcement personnel, via targeted aerial surveillance, have the *purpose to intrude and attempt to obtain information* from a protected area, such as the home or its curtilage, that could not otherwise be obtained without physical intrusion into that area, that aerial surveillance constitutes a search for purposes of Article II, Section 10.

*Davis III*, 2014-NMCA-042, ¶ 20 (emphasis added).

**{100}** I would decline to perpetuate a multi-factored analysis to inform constitutional privacy protections. This Court has long interpreted the protections of Article II, Section 10 by acknowledging the need to balance governmental interests against individual privacy interests. *See State v. Attaway*, 1994-NMSC-011, ¶ 24, 117 N.M. 141, 870 P.2d 103 ("Article II, Section 10 embodies the disparate values of privacy, sanctity of the home, occupant safety, and police expedience and safety."), *holding modified on other grounds by State v. Lopez*, 2005-NMSC-018, ¶¶ 18-19, 138 N.M. 9, 116 P.3d 80. To evaluate whether a search and seizure violates the protections of the New Mexico Constitution, courts judge "the facts of each case by balancing the degree of intrusion into an individual's privacy against the interest of the government in promoting crime prevention and detection." *State v. Jason L.*, 2000-NMSC-018, ¶ 14, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted).

**{101}** I would hold that under the second prong in the *Katz* test, an individual's reasonable expectation of privacy from aerial surveillance is coextensive with the scope of his or her reasonable expectation of privacy from ground surveillance. Therefore, the reasonableness of an individual's expectation of privacy from aerial surveillance is determined by the steps

he or she took to ward off ground surveillance. My analysis is guided by the long-held notion that society recognizes that an individual's curtilage enjoys the same privacy protections as his or her home. *Hamilton*, 2012-NMCA-115, ¶ 16. In addition, Article II, Section 10 does not require that extraordinary steps be taken to protect against ground-level observation for an individual to assert a reasonable expectation of privacy against government-initiated aerial surveillance. *See* N.M. Const. art. II, § 10; 1 LaFave, *supra*, § 2.6(c), at 898-99. "[T]he fact that government officials or the civilian public might be expected, for one reason or another, to enter a place or see or hear the activities within, does not necessarily preclude reasonable claims of privacy from intensive spying by police officers looking for evidence of crime." *Cook*, 710 P.2d at 304. Ultimately, "while an inhabitant of the modern world is deemed to *expect . . . the expectable*, the Constitution still shields him [or her] from governmental intrusions he [or she] has legitimate grounds not to expect." *Id.* (omission in original) (emphasis added) (internal quotation marks and citation omitted).

**{102}** For example, although an individual may expect the government to electronically eavesdrop on a private telephone conversation, an individual still exhibits an expectation of privacy that society recognizes as reasonable by secluding himself or herself when placing such a phone call. *Katz*, 389 U.S. at 353. Similarly, although an individual may expect the government to rummage through the contents of garbage bags placed in a communal dumpster, an individual still exhibits an expectation of privacy that society recognizes as reasonable by concealing his or her trash in an opaque garbage bag. *Crane*, 2014-NMSC-026, ¶ 27. Finally, hotel guests may also expect that housekeeping staff may enter their room or that police officers may open their unlocked hotel room door, but hotel guests still exhibit an expectation of privacy that society recognizes as reasonable by simply closing the hotel room door. *See, e.g.*, *Stoner v. California*, 376 U.S. 483, 489-90 (1964).

**{103}** Using the same reasoning, the citizens of New Mexico may expect any passerby to glance at the intimate details of their curtilage, but our citizens also exhibit an expectation of privacy that society recognizes as reasonable if the individuals took reasonable steps to prevent ground-level observation. In this case, Defendant not only obstructed the view into his greenhouse by constructing it some distance away from his southern property line behind trees and a screened garden, but he also covered the exterior walls with black plastic. These steps were not only reasonable in protecting against ground-level observation, but they were ultimately effective in preventing anyone from seeing "into the greenhouse[] from the ground." Based on these actions alone, society would recognize that Defendant's expectation of privacy was reasonable. I would therefore conclude that this reasonable expectation of privacy precludes aerial surveillance without a warrant. It is also significant that by constructing the greenhouse close to his home and completely enclosing it, Defendant's greenhouse more closely resembled an enclosed structure similar to a residential garage than an open backyard. Society clearly would find it reasonable for Defendant to have an expectation of privacy in the contents of a fully enclosed greenhouse located on his curtilage. *See Taylor v. United States*, 286 U.S. 1, 5-6 (1932) (holding that a garage was protected from a warrantless search because the garage was adjacent to the defendant's

29

home); *United States v. Mullin*, 329 F.2d 295, 298 (4th Cir. 1964) (holding that an outdoor smokehouse was protected from a warrantless search because the smokehouse was 75 feet from the defendant's residence and there was no intervening barrier between the two buildings to remove it from the curtilage); *but cf. United States v. Dunn*, 480 U.S. 294, 302 (1987) (holding that the defendant did not have a reasonable privacy interest in a barn located 60 yards from his home because the barn lay outside the fence enclosing the home, and thus it was not part of the curtilage).

**{104}** I would conclude that Defendant's subjective expectation of privacy from aerial surveillance is reasonable because of the steps he took to prevent ground-level surveillance. The State Police were required to obtain a warrant prior to conducting an aerial or ground search of the contents of Defendant's greenhouse during the operation. I accordingly would hold that the aerial surveillance of Defendant's property was unconstitutional.

**B.     The evidence seized from Defendant's greenhouse was not sufficiently attenuated from the warrantless aerial search**

**{105}** I am in complete agreement with the majority that the evidence seized by the State Police was not sufficiently attenuated to purge it of the unconstitutional warrantless search. Majority op. ¶ 59. To preface this discussion, I would emphasize that I am not foreclosing the ability of law enforcement personnel to use constitutional investigative efforts in similar cases. The operation in this case was conducted as a result of anonymous tips reporting that marijuana was being grown in rural areas of Taos County. The anonymous tips did not provide either any names or the specific residences of the people who were allegedly growing marijuana. Based on these anonymous tips, the State Police narrowed its search to the Carson Estates and Twin Peaks areas of Taos County. As this Court recognized in *State v. Urioste*, " '[a]n anonymous tip may justify an investigatory stop if the information is sufficiently corroborated by subsequent investigation to establish reliability.' " 2002-NMSC-023, ¶ 16, 132 N.M. 592, 52 P.3d 964 (quoting *State v. Flores*, 1996-NMCA-059, ¶ 8, 122 N.M. 84, 920 P.2d 1038). However, " 'if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.' " *Id.* ¶ 17 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

**{106}** The uncertain reliability of the anonymous tips in this case, coupled with "[t]he overwhelming volume of testimony . . . that one could not see into the greenhouse[] from the ground," required State Police personnel to investigate further using constitutional methods. *Id.* In the absence of reasonable suspicion, we have encouraged police officers to either (1) utilize a confidential informant or an undercover officer to observe suspicious activity; (2) "*attempt to gain consent to search the residence or perform a 'knock and talk' to try and gain information*"; or (3) speak with neighbors about whether they had observed any suspicious activities. *State v. Nyce*, 2006-NMSC-026, ¶ 23, 139 N.M. 647, 137 P.3d 587 (emphasis added), *holding limited on other grounds by State v. Williamson*, 2009-NMSC-039, 146 N.M. 488, 212 P.3d 376. In this case, the State Police officers relied on non-

specific tips that they received over two years to conduct indiscriminate aerial surveillance of all private property in a vast area of Taos County. The New Mexico Constitution requires law enforcement officers to employ constitutional methods to develop probable cause to believe that a specific property contains evidence of a crime. I would make it clear that aerial surveillance is not a constitutional method.

{107} Even where consent is voluntary, consent is not constitutionally free of illegal taint where the police misconduct was "directly related to the ensuing event of . . . giving consent." *Davis v. Commonwealth*, 559 S.E.2d 374, 380 (Va. Ct. App. 2002). Because Defendant took reasonable steps to protect his privacy that exhibited a reasonable expectation of privacy, the State Police should have attempted to corroborate their anonymous tips by employing one of the three listed constitutional methods. The State Police then likely would have established probable cause to support a search warrant. However, the subsequent utilization by the State Police of the constitutional "knock and talk" investigative tactic cannot purge Defendant's consent from the original taint of the unconstitutional warrantless aerial search. Accordingly, I agree that all evidence seized from Defendant's property must be suppressed.

{108} For the foregoing reasons, I respectfully concur with the result reached by the majority.

---

**EDWARD L. CHÁVEZ, Justice**